The STATE of Ohio Appellee,

v.

ARMSTRONG, Appellant.

[Cite as *State v. Armstrong,* 152 Ohio App.3d 579, 2003-Ohio-2154.]

Court of Appeals of Ohio,
Ninth District, Lorain County.

Nos. 02CA008088 and 02CA008089.

Decided April 30, 2003.

580

582

Jeffrey H. Manning, Lorain County Prosecuting Attorney, and Anthony D. Cillo, Assistant Prosecuting Attorney, for appellee.

Kreig J. Brusnahan, for appellant.

WHITMORE, Judge.

{¶ 1} Defendant-appellant Richard Armstrong has appealed from his convictions in the Lorain County Court of Common Pleas for pandering obscenity involving a minor, illegal use of a minor in nudity-oriented material or performance, rape with sexually violent predator specifications attached, gross sexual imposition, and attempted rape. This court affirms.

## I

{¶ 2} On June 20, 2001, the Lorain County Grand Jury indicted appellant in two separate cases on numerous counts of pandering obscenity involving a minor, in violation of R.C. 2907.321(A)(1) and 2907.321(A)(3); illegal use of a minor in nudity-oriented material or performance, in violation of R.C. 2907.323(A)(2); rape, in violation of R.C. 2907.02(A)(1)(b), with sexually violent predator specifications attached to each count; gross sexual imposition, in violation of R.C. 2907.05(A)(4); and attempted rape, in violation of R.C. 2923.02(A) and 2907.02(A). The state filed a motion to consolidate the two cases on February 14, 2002, and the trial court granted the motion on February 21, 2002.

{¶ 3} Appellant entered a plea of not guilty by reason of insanity on December 3, 2001; the trial court then referred appellant to the Nord Community Mental Health Center to determine appellant's competency to stand trial. After appellant was found competent to stand trial, the case proceeded to a jury trial.

{¶ 4} After the state rested its case, appellant moved for acquittal pursuant to Crim.R. 29. The trial court denied the motion, and the defense presented its case. The jury found, by a preponderance of the evidence, that appellant did not satisfy his burden of proving not guilty by reason of insanity. The jury further found appellant guilty on all counts as charged in the indictments, including the sexually violent predator specifications attached to each count of rape; appellant was later determined to be a sexual predator. The trial court sentenced appellant accordingly. Appellant has timely appealed, asserting four assignments of error.

## II

### Assignment of Error Number One

"Appellant's rights were violated when the trial court imposed maximum consecutive sentences in violation of R.C. 2929.14(B) and (C) without making a finding that such sentences were justified."

{¶ 5} In appellant's first assignment of error, he has argued that the trial court erred by imposing maximum and consecutive sentences. Specifically, appellant has argued that the trial court failed to make a finding that maximum and consecutive sentences were justified, in contravention of R.C. 2929.14(C) and R.C. 2929.19(B)(2)(d) and (e), and R.C. 2929.14(E) and 2929.19(B)(2)(c). We disagree.

{¶ 6} An appellate court may remand a matter on appeal for resentencing if it clearly and convincingly finds that the court's findings are unsupported by the record or that the sentence imposed by the trial court is otherwise contrary to law. R.C. 2953.08(G)(2). Clear and convincing evidence is evidence " 'which will produce * *. * a firm belief or conviction as to the allegations sought to be established.' " *State v. Eppinger* (2001), 91 Ohio St.3d 158, 164, 743 N.E.2d 881, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 53 O.O. 361, 120 N.E.2d 118.

{¶ 7} When a trial court imposes a maximum sentence, it must make findings pursuant to R.C. 2929.14(C) and state its reasons pursuant to R.C. 2929.19(B)(2)(d) and (e). *State v. Edmonson* (1999), 86 Ohio St.3d 324, 328, 715 N.E.2d 131; see, also, *State v. Newman,* 9th Dist. No. 20981, 2002-Ohio-4250, 2002 WL 1906554, at ¶ 8, appeal allowed (2002), 97 Ohio St.3d 1481, 780 N.E.2d 286. As with maximum sentences, a trial court that imposes consecutive sentences must also state its findings and reasons on the record pursuant to R.C. 2929.14(E)(4) and 2929.19(B)(2)(c). *State v. Jones* (2001), 93 Ohio St.3d 391, 399, 754 N.E.2d 1252.

{¶ 8} In the instant case, appellant was sentenced to the maximum term of imprisonment on each count for which he was sentenced. Appellant was also ordered to serve consecutive sentences. Because the trial court sentenced appellant to maximum and consecutive sentences, the trial court was required to comply with R.C. 2929.14(C) and 2929.19(B)(2)(d) and (e), and R.C. 2929.14(E)(4) and 2929.19(B)(2)(c). A review of the record reveals that the trial court substantially complied with the stated provisions.

{¶ 9} During the sentencing hearing, the state reminded the trial court that it must list the factors it found relevant in sentencing appellant to maximum and consecutive sentences. The following exchange took place between the state and the trial court:

"[THE COURT:] Anything further from anyone else?

"MR. CILLO: Yes, Your Honor, the factors to justify the maximum sentence.

"THE COURT: Yes. The Court finds that—and I don't have the factors in front of me. Mr. Cillo, can you please list them to me, for me, at this point.

"MR. CILLO: Your Honor, for exceeding the minimum term for a prison term, it's both the shorter term will demean the seriousness of the defendant's conduct, or the prison term will not adequately protect the public from future crime by [appellant] or others.

"THE COURT: So be it.

"MR. CILLO: Both of them?

"THE COURT: So be it.

"MR. CILLO: For imposing the maximum prison term, the Court finds that the reasons stated on the record, pursuant to Ohio Revised Code 2929.14(C), that [appellant] has committed the worst form of the offense, or that [appellant] imposes the greatest likelihood of recidivism.

"THE COURT: So be it be.

"MR. CILLO: Both of them?

"THE COURT: Yes

"MR. CILLO: Pursuant to Ohio Revised Code 2929.14(E), the Court finds, for the reasons stated on the record, that consecutive sentences are necessary to protect the public from future crime, or to punish [appellant], and are not disproportionate to the seriousness of [appellant's] conduct, and the danger [appellant] poses to the public.

"THE COURT: First and third, sir.

"MR. CILLO: That's all just one.

"THE COURT: Well, okay; all right. That's just one of them, then it's all got to be inclusive.

"MR. CILLO: Also, the Court may find that the harm caused was so great or unusual that no single—for any of the offenses committed as part of a single course of conduct and adequately reflects the seriousness of [appellant's] conduct.

"THE COURT: So be it.

"MR. CILLO: [Appellant's]—that will not fit, Your Honor. I believe those are all of them.

"THE COURT: Yes, sir. Thank you, Mr. Cillo.

"MR. CILLO: In both cases?

"THE COURT: In both matters. Thank you, Mr. Cillo."

{¶ 10} With respect to the above-cited discussion, appellant has argued that the "mere response of 'So be it' to the prosecutor's recitation of the statutory factors is insufficient as a matter of law to support the imposition of maximum consecutive sentences." We disagree. Although it is the better practice for a trial court to make its findings for imposing maximum and consecutive sentences on the

record *without* prompting from the state, such a method of placing the findings on the record is not legally deficient. Moreover, the trial court's use of the words "So be it" in response to the state's recitation of the statutory criteria does not on its face support an argument that the court failed to consider the facts in the sentencing record relevant to the statutory findings.[1] As such, we find that the trial court made the required findings on the record and thus substantially complied with R.C. 2929.14(C) when it imposed maximum sentences and R.C. 2929.14(E) when it imposed consecutive sentences.

{¶ 11} The trial court also supplied its reasons for imposing maximum and consecutive sentences, thereby complying with R.C. 2929.19(B)(2)(d) and (e) and R.C. 2929.19(B)(2)(c). At the sentencing hearing, the trial court stated:

"[Appellant], for seven days I sat here and listened to evidence as to your crimes against society. In my 43 years as a member of the legal profession, and my 12 plus years on the bench, never have I seen or heard a more revolting account of crimes that you have been convicted of committing.

"When I was a youngster, and while World War II was still going on, I and some of my friends would sit down and discuss the type of death we would impose on Adolph [sic, Adolf] Hitler if ever we had captured him. Believe me, in hindsight, some of the deaths that some of us would impose were quite bizarre. As bizarre as they were, they didn't even come close to what you have done.

"I find it difficult believing that one human being could do this to another human being, and especially children, and even more especially to one's own daughter. Even your dog, sir, a family pet, a dumb animal, would not have done such a thing unless you put him up to it, and you did."

{¶ 12} Because the record reveals that the trial court complied with R.C. 2929.14(C) and R.C. 2929.19(B)(2)(d) and (e) when it imposed maximum sentences, and with R.C. 2929.14(E)(4) and 2929.19(B)(2)(c) when it imposed consecutive sentences, this court cannot clearly and convincingly find that the sentence imposed upon the defendant was not supported by the record or is otherwise contrary to law. Consequently, appellant's first assignment of error lacks merit.

### Assignment of Error Number Two

"The guilty verdicts should be reversed because the evidence shows that appellant met his burden of proving insanity; thus the jury's verdict was against the manifest weight of the evidence."

---

1. We are, however, compelled to note that the manner in which the trial court fulfilled its responsibility in this most egregious case demeans the dignity of the judicial process.

{¶ 13} In appellant's second assignment of error, he has argued that he met his burden of proving, by a preponderance of the evidence, the defense of not guilty by reason of insanity and that the jury's rejection of the insanity defense was against the manifest weight of the evidence. Specifically, appellant has argued that, at the time of the alleged criminal conduct, he was suffering from a severe mental disease or defect, and therefore he was unaware of the wrongfulness of his actions. We disagree.

{¶ 14} In reviewing whether a conviction is against the manifest weight of the evidence, this court must:

"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, 340, 515 N.E.2d 1009.

{¶ 15} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. *Otten,* 33 Ohio App.3d at 340, 515 N.E.2d 1009.

{¶ 16} A plea of not guilty by reason of insanity is an affirmative defense that must be proven by a preponderance of the evidence. R.C. 2901.05(A); *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 242, 714 N.E.2d 867, certiorari denied (2000), 528 U.S. 1090, 120 S.Ct. 821, 145 L.Ed.2d 691, citing *State v. Brown* (1983), 5 Ohio St.3d 133, 5 OBR 266, 449 N.E.2d 449. To succeed upon such a defense, a party must prove that "at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14); *State v. Caes* (Mar. 9, 2001), 2d Dist. No. 17917, 2001 WL 227356, appeal not allowed (2001), 92 Ohio St.3d 1441, 751 N.E.2d 481. However, "[p]roof that a person's reason, at the time of the commission of an offense was so impaired that the person did not have the ability to refrain from doing the person's act or acts, does not constitute a defense." *State v. Sanders* (July 21, 2000), 2d Dist. No. 17718, 2000 WL 1006574.

{¶ 17} "The weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts." *State v. Thomas* (1982), 70

Ohio St.2d 79, 24 O.O.3d 150, 434 N.E.2d 1356, syllabus. The trier of fact may reject an affirmative defense on the grounds of credibility. Id. at 80, 24 O.O.3d 150, 434 N.E.2d 1356. If the record demonstrates that the trier of fact has considered the insanity defense, the reviewing court should defer to the trier of fact's interpretation of the evidence. See State v. Curry (1989), 45 Ohio St.3d 109, 114, 543 N.E.2d 1228. A trial court's judgment as to the defense of insanity will be reversed only where overwhelming and uncontradicted evidence to the contrary is arbitrarily ignored. *State v. Duncan* (Sept. 12, 2001), 9th Dist. No. 3117–M, 2001 WL 1044206, at 18, citing *Brown,* 5 Ohio St.3d at 134–135, 5 OBR 266, 449 N.E.2d 449.

{¶ 18} In the instant matter, two experts, Drs. Victoria Codispoti and Phillip Resnick, presented testimony regarding appellant's mental state at the time the alleged crimes were committed. Dr. Codispoti, a board-certified psychiatrist, testified on behalf of the defense. Dr. Codispoti stated that she had a number of years of training and had treated people with sexual disorders of all types. She further explained that she was trained to interview and diagnose patients for the purpose of determining whether a patient was not guilty by reason of insanity.

{¶ 19} Dr. Codispoti testified that she interviewed appellant for approximately eight hours in preparing a diagnosis of appellant. She also reviewed police records and videotapes[2] seized by the police; Dr. Codispoti admitted, however, that she viewed the videotapes only prior to testifying at trial and had not seen the videotapes when she wrote either of her reports on appellant's mental condition. The doctor did not interview appellant's wife or his business partner in completing her diagnosis of appellant.

{¶ 20} Based on her interview with appellant, Dr. Codispoti concluded, to a reasonable degree of medical certainty, that appellant suffered from bipolar illness, recent episode being mixed, "which is also known as manic-depressive illness in the local community"; she later explained that the disorder was a "serious mental illness, because it has—it is something that needs treatment, and lifelong treatment, and needs to be managed in other respects, besides just medication." Dr. Codispoti also diagnosed appellant with impulse-control disorder, which included trichotillomania and self-mutilation; paraphilia, "which involves a number of abnormal sexual activities, including pedophilia,"[3] and borderline personality disorder.

---

2. Appellant videotaped S.B., his sister-in-law, in the nude. He also taped his minor daughter, J.A., having sex with the family dog.

3. Dr. Codispoti described paraphilia as "a disorder where a person has intense and intrusive fantasies in their mind related to sexual issues, and those fantasies are so strong that they are

{¶ 21} Dr. Codispoti further explained to the jury how appellant could conceivably do something that was morally and legally wrong but not understand the wrongfulness of his actions. Dr. Codispoti stated:

"[Appellant] would know the wrongfulness prior to when he did it. He would not know it at the moment he's doing it, and he would again—after the moment was over, it was all done, he would then recognize and—actually recognize the wrongfulness, and feel guilt and remorse about that."

{¶ 22} Dr. Codispoti described the mental process appellant may have experienced prior to committing the criminal acts for which he was charged:

"Generally, in most persons who commit those sort of acts, there is a level of agitation and tension that starts. Often there's a stressor of some type, and then that stressor causes the person to feel agitated and nervous, and at the same time, they're starting to have fantasies. Usually, these sexually—intense sexual fantasies could be of masturbating, or could be of anything relating to sexuality.

"As that agitation increases and the fantasies increase, the person at this point still knows that what—what they're doing may be wrong, but what happens is, when they finally commit whatever act they commit, at that point they are almost trance-like, but they are doing it without knowledge, without knowing that it's wrong, until it's over, whatever that means; we don't always know what that means.

"And then the person suddenly becomes aware that what they were doing is horribly wrong, and then they get guilty and remorseful, and tell themself [sic], 'How could I have done this.' "

{¶ 23} Finally, Dr. Codispoti testified that appellant was unable to distinguish the rightfulness and wrongfulness of his conduct at the time he committed the criminal acts for which he was charged. During direct examination, defense counsel asked Dr. Codispoti:

"Based upon your education and training and experience, your interviews with the client, together with all of the materials that you've received in this case, are you able to say, to a reasonable degree of medical certainty—* * * whether at the time of the offenses which were committed and bring us to court, [appellant] knew the wrongfulness of his conduct?"

{¶ 24} Dr. Codispoti replied: "[Appellant] did not know the wrongfulness of his conduct at the moment when he was acting out." This diagnosis, Dr. Codispoti testified, was based primarily on what appellant told her during their interview.

---

often not under the control of the person, and those fantasies often involve children, non-consenting partners or objects, parts of people's anatomy."

{¶ 25} Despite testimony from the defense's expert witness Dr. Codispoti, the jury was presented with other evidence that contradicted Dr. Codispoti's belief that appellant did not know the wrongfulness of his actions at the time he committed the alleged crimes; some of the contradictory testimony even came from Dr. Codispoti herself. During direct examination, Dr. Codispoti conceded that the fact that a person is suffering from bipolar disorder or paraphiliac disorder does not necessarily mean that the person would be unable to know the wrongfulness of a particular act. Dr. Codispoti also conceded that two other doctors, Drs. Haglund and Resnick, did not agree with her diagnoses. She testified that Dr. Resnick did not believe that appellant was legally insane at the time of the offenses, and she further conceded that Dr. Resnick's specialization was more "tailored to insanity."

{¶ 26} Dr. Resnick, a board-certified psychiatrist with qualifications in forensic psychiatry, testified on behalf of the state. On rebuttal, Dr. Resnick stated that in preparing for the diagnosis of appellant, he interviewed appellant for approximately four and one-half hours; reviewed police records, a transcript of the police interview, bill of indictment, bill of particulars, and police investigation reports; interviewed appellant's wife and his business partner, Skip Skolnik; and read Dr. Codispoti's report concerning appellant.

{¶ 27} Dr. Resnick diagnosed appellant with pedophilia, with sexual masochism; sexual sadism; paraphilia, not otherwise specified; and mixed personality disorder. Unlike Dr. Codispoti's diagnosis, Dr. Resnick determined that appellant did not meet the criteria for bipolar disorder. The doctor further explained that pedophilia does not cognitively affect a person's ability to know the wrongfulness of his conduct. In fact, Dr. Resnick testified that in his opinion "a severe mental disease would actually not include the sexual disorders, such as pedophilia, sadism, or masochism." Dr. Resnick also believed that paraphilia and personality disorders were not severe mental disorders, as required for the insanity defense.

{¶ 28} During direct examination, Dr. Resnick referred to the videotapes confiscated from appellant as a "boon" because the videotapes "provided an opportunity to see [appellant] behaving and speaking while engaged in criminal acts." Based in part on the videotapes, Dr. Resnick was able to determine that appellant was not suffering from a mood disorder during the commission of the criminal acts.

{¶ 29} Dr. Resnick also testified to what appellant's business partner Skip Skolnick and appellant's wife told him during telephone interviews. Skip Skolnik told Dr. Resnick that he did not know appellant socially but that he never observed any "psychiatric abnormalities" in appellant. Dr. Resnick explained that Skolnik's observations did not comport with appellant's claim of insanity

because "if someone truly had bipolar disease, frank bipolar disease with highs and lows, you certainly would expect a business partner to see elevated mood and depressed mood, because that would be pretty evident if someone was in contact on a day-to-day basis." In addition, appellant's wife told Dr. Resnick that "she did not see [appellant] having any more than * * * the ordinary kind of ups and downs that everyone has, but nothing that would cause her to think that he ought to see a psychiatrist."

{¶ 30} With respect to the sexual experiences appellant had with his daughter J.A., Dr. Resnick stated that appellant told him:

"[Appellant] had many sexual experiences with his daughter, some of which were videotaped, and some of which were not. They included—[appellant] acted like a director with a video camera and instructed her to have sex with the dog, at times instructed her to pretend to have sex with another girl, kind of mock sex, and that he also had sexual activities directly with her, including intercourse, in which he would reach a sexual climax and ejaculate."

{¶ 31} Dr. Resnick also testified that appellant told him that during the times he had sex with his daughter "[h]alf the time [appellant] might have been depressed, and half the time [appellant] had no disturbance of [his] mood." Further, Dr. Resnick testified that when appellant had sex with J.A., appellant would wait for J.A.'s mother to go to bed "because he knew that [appellant's wife] would not approve of his activities, and so * * * [appellant] deliberately waited until he was alone and unlikely to be discovered." Because appellant waited until his wife went to sleep before he engaged in sexual conduct with his daughter and her friends, Dr. Resnick testified that such an act suggested that appellant knew that what he was doing was wrong. Finally, Dr. Resnick testified:

"[Appellant] told me that before he committed the acts he knew they were wrong, that after he committed the acts he knew they were wrong, but that during the acts, he said his mind, like a light switch, would be altered, and he would not know that [the sexual acts] were wrong."

{¶ 32} Dr. Resnick did not find appellant's explanation of his mental state during the time the sex acts were committed believable because:

"[T]hat's just not how the mind works. One does not stop having knowledge of wrongfulness. * * * So there's just no reason * * * to believe that [appellant] stopped knowing the wrongfulness of the illegal activity, since he knew it before, he knew it after, and there is no psychiatric explanation as to why he would not know it during the activities."

{¶ 33} In Dr. Resnick's opinion, "[appellant] did not qualify for insanity, because there is substantial evidence that he knew his acts were wrong when he did them." This conclusion was based on several factors. Dr. Resnick explained:

"First of all, [appellant] told me that he knew that the acts were wrong, and these include all the illegal acts, sex with his daughter, sex with other people, engaging in pornographic material, and so forth. He said he knew all of those acts were wrong before he did them and after he did them. * * * Furthermore, [appellant] said he prayed to stop his illegal activities, suggesting he knew it was wrong, that he apologized to his daughter frequently after the illegal activities, showing wrongfulness. * * * When he was arrested, he lied to the police when he was questioned, and he said that was because he was afraid he would go to jail. He was afraid to go to jail because he knew his activities were wrong, and he even took steps to avoid detection around the time of the act. First, he waited until his wife went to bed; secondly, he told [J.A.] not to tell anyone about the activities, showing that he knew his acts were wrong; and thirdly, that [appellant] told [J.A.'s] friends to say that the money he was giving them for their sexual activity was actually money for cleaning the studio. * * *

"In addition, in regard—I understand he's charged with having sex with S.B., his sister-in-law, when she was a minor, and he told me that—he actually told me that he waited until she was 18, because he knew having sex with a minor was wrong. So if the jury is convinced that she was a minor at the time, then he acknowledged that he knew having sex with a minor was wrong.

"* * * [Appellant] did know it was wrong in the sense that he avoided detection, he lied about it, he had no delusion or hallucination or psychotic ideas or anything that would put him out of touch with reality, that would cause him to believe what he was doing was right."

{¶ 34} Dr. Resnick stated that the reason appellant engaged in the illegal sexual conduct with his daughter and her friends was because of appellant's sexual drive. "I think a much more reasonable and likely explanation is that due to his sexual drive he elected to override the needs of his daughter for protection to meet his own sexual gratification, in spite of knowing that it was wrong."

{¶ 35} Although Drs. Resnick and Codispoti presented the jury with two competing theories on appellant's mental state at the time he committed the alleged criminal acts, it was in the jury's discretion to attach more credibility to Dr. Resnick's testimony than to Dr. Codispoti's testimony because it is the responsibility of the jury to determine the correctness of divergent opinions. *State v. Bowman* (Aug. 12, 1988), 6th Dist. No. L–87–337, 1988 WL 84367, quoting *State v. Whitman* (1984), 16 Ohio App.3d 246, 250, 16 OBR 269, 475 N.E.2d 486. A jury "makes that determination by weighing the testimony, applying the usual test of credibility, finding the presence or absence of facts constituting the hypothesis, and by drawing its own inferences and conclusions from the principles explained." (Quotations omitted.) Id. Here, the jury appar-

ently chose to accord more weight to Dr. Resnick's testimony. Based upon our review of all the evidence, we find that the conviction was not against the manifest weight of the evidence. As such, appellant's second assignment of error is not well taken.

### Assignment of Error Number Three

"Appellant was denied his right to a fair trial when the state's expert witness advised the jury that a finding of [not guilty by reason of insanity] in this case would be against public policy thereby infringing upon the role of the jury, resulting in prejudicial, reversible error."

 {¶ 36} In appellant's third assignment of error, he has argued that he was denied his right to a fair trial when the state's expert advised the jury that a finding of not guilty by reason of insanity would be against public policy. We disagree.

{¶ 37} During direct examination, the state asked Dr. Resnick: "In your opinion, is the diagnosis of sexual masochism a mental disease or disorder that's available for the insanity defense in Ohio?" Dr. Resnick responded:

"In my opinion, a severe mental disease would actually not include sexual disorders, such as pedophilia, sadism, or masochism. Those are sexual disorders, but they aren't severe mental diseases in the sense that they cause someone to be out of touch with reality, and I—because I think the alternative is, if you said pedophilia, for example, was a mental disease for purposes of insanity, then you would potentially be excusing, you know, kind of having open season on people having sex with a child and not going to prison. *I think that would be a bad public policy, if you were to call pedophilia a mental disease for purposes of insanity.*" (Emphasis added.)

{¶ 38} Appellant has argued that Dr. Resnick "overstepped the permissible boundaries of expert witness testimony when he stated to the jury that a finding of [not guilty by reason of insanity] in a person who presents with Paraphilia would be against public policy * * * and would result in sex offenders not being held accountable for their actions with regard to punishment[.]" Despite appellant's arguments, the record reveals that defense counsel did not object to Dr. Resnick's testimony, move to strike the testimony, or request the court to give the jury a curative instruction regarding the doctor's testimony.[4]

---

4. Both parties have incorrectly assumed that appellant opened the door to Dr. Resnick's testimony concerning public policy issues during appellant's cross-examination of Dr. Resnick. However, the record reveals that the state actually opened the door to such testimony during direct examination of its expert. In any event, appellant failed to object to the doctor's testimony.

{¶ 39} It is a fundamental principle of appellate review that a court will not consider an error that an appellant was aware of yet failed to bring to the attention of the trial court. *State v. Maurer* (1984), 15 Ohio St.3d 239, 260, 15 OBR 379, 473 N.E.2d 768, certiorari denied (1985), 472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 728; see, also, *State v. Awan* (1986), 22 Ohio St.3d 120, 122, 22 OBR 199, 489 N.E.2d 277. Because appellant failed to bring the error to the attention of the trial court, he has waived this claim for appeal.

{¶ 40} Assuming arguendo that appellant did not waive this issue on appeal, we find that defense counsel invited further error and compounded any previous prejudice that might have occurred as a result of the doctor's testimony, by asking the doctor to expound on his public policy opinions during cross-examination. On cross, defense counsel asked Dr. Resnick: "[I]s public policy something that a scientist takes into account in drawing a conclusion, or giving a reason for things?" Dr. Resnick responded:

"Well, I think that each—with respect to what is a mental disease for purposes of insanity, it is not discretely defined by the law in Ohio, and therefore, it's ultimately a question for the jury. I simply gave my opinion that if pedophilia or other paraphilias were viewed as severe mental diseases, it would have the potential to hold no sexual offender accountable for his act with regard to punishment. But ultimately, I agree with you that that's a jury decision to make."

{¶ 41} Although it is not clear why defense counsel asked Dr. Resnick this question, the question enabled the doctor to highlight his public-policy opinions for the jury. Under the doctrine of invited error, a party will not be permitted to take advantage of an error that he himself invited or induced the trial court to make. *State v. Bey* (1999), 85 Ohio St.3d 487, 493, 709 N.E.2d 484, certiorari denied (1999), 528 U.S. 1049, 120 S.Ct. 587, 145 L.Ed.2d 488; see, also, *State v. Hill* (1987), 37 Ohio App.3d 72, 75–76, 523 N.E.2d 894. Accordingly, we find that appellant has waived the issue of Dr. Resnick's public policy comments on appeal and is further barred by the doctrine of invited error from raising the issue on appeal. As such, appellant's third assignment of error is not well taken.

## Assignment of Error Number Four

"[Appellant's] right to a fair trial guaranteed by the due process provisions of [Section 16, Article I] of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution were violated by the misconduct of the prosecutor when it repeatedly provided the jury with irrelevant and unfairly prejudicial hearsay testimony in violation of the rules of evidence."

{¶ 42} In appellant's fourth assignment of error, he has argued that his constitutional right to a fair trial was violated by misconduct of the prosecutor. Specifically, appellant has argued that the state engaged in prosecutorial misconduct when it questioned the testifying experts about an incident that occurred when he was in tenth grade. We disagree.

{¶ 43} As an initial matter, we note that appellant failed to object when the state questioned Drs. Resnick and Codispoti regarding the sexual conduct that occurred when appellant was in the tenth grade. Failure to raise an issue at the trial court level usually precludes this court from reviewing the issue. *Maurer*, 15 Ohio St.3d at 260, 15 OBR 379, 473 N.E.2d 768. However, appellant has asserted that this court should employ the plain-error standard of review.

{¶ 44} Plain error is defined as "error but for the occurrence of which it can be said that the outcome of the trial would have clearly been otherwise." *State v. Sanders* (May 17, 2000), 9th Dist. No. 19783, 2000 WL 631978. The Ohio Supreme Court has recognized that the plain-error doctrine should be applied sparingly and only when necessary to prevent a clear miscarriage of justice. Id., citing *State v. Wolery* (1976), 46 Ohio St.2d 316, 327, 75 O.O.2d 366, 348 N.E.2d 351, certiorari denied (1976), 429 U.S. 932, 97 S.Ct. 339, 50 L.Ed.2d 301. "To exercise [the plain-error doctrine] freely would undermine and impair the administration of justice and detract from the advantages derived from orderly rules of procedure." *State v. Long* (1978), 53 Ohio St.2d 91, 96, 7 O.O.3d 178, 372 N.E.2d 804, quoting *Gendron v. United States* (C.A.8, 1961), 295 F.2d 897, 902. Thus, this court should take notice of plain error "to correct only egregious errors— those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings." *Leygraff v. Andren* (Dec. 1, 1994), 8th Dist. No. 65811, 1994 WL 677530; see, also, *United States v. Atkinson* (1936), 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 ("In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings.").

{¶ 45} In conducting a plain-error analysis, this court must employ a three-prong analysis: (1) determine whether there is an error, i.e., a deviation from a legal rule; (2) if there is an error, determine whether the error is plain, which means that it "must be an 'obvious' defect in the trial proceedings"; and (3) determine whether the error has affected substantial rights, which means that "the trial court's error must have affected the outcome of the trial." *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 45, quoting *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. Accordingly, this court

must first determine whether the state deviated from a legal rule when it questioned the testifying experts about appellant's eighth-grade girlfriend.

{¶ 46} The test for prosecutorial misconduct is whether the remarks made were improper, and if they were, whether they prejudicially affected the substantial rights of appellant. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Prosecutorial misconduct is not grounds for error unless the defendant has been denied a fair trial. *Maurer*, 15 Ohio St.3d at 266, 15 OBR 379, 473 N.E.2d 768. A showing of actual prejudice is required to show that a substantial right was affected. *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 596. Moreover, alleged prosecutorial misconduct must be evaluated within the context of the entire trial. *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203.

{¶ 47} In the instant case, the state questioned Drs. Resnick and Codispoti about a prior incident that occurred between appellant, an ex-girlfriend, and a dog. The questions concerning this matter were precipitated by Dr. Codispoti's testimony that appellant may not have known that it was wrong for him to force his daughter to have sex with the family dog at the time he was committing the act. In an attempt to rebut Dr. Codispoti's testimony, the state questioned Dr. Codispoti about appellant's tenth-grade relationship with his then eighth-grade girlfriend. The following exchange took place:

"Q. Well, you know that [appellant], in his statement to [defense counsel] and Dr. Resnick, said that when he was in 10th grade he made his girlfriend in 8th grade have sexual intercourse with a dog because he wanted to manipulate her, correct?

"A. I think his statement was he wanted her to prove that she loved him.

"* * *

"Q. Well, on Friday when I asked you that question, you indicated and read that report, and said, 'Yes, manipulation,' do you recall that?

"A. Yes, I recall that.

"Q. Does manipulation indicate somebody knows something's wrong?

"A. Some people who manipulate don't realize that it's wrong.

"* * *

"Q. So he said when he did it to manipulate his girlfriend in 10th grade he knew it was wrong, didn't he?

"A. He always knows it's wrong?

"Q. No, he says he knew when he was doing it, it was wrong.

"A. Okay.

"Q. You're not saying he was legally insane when he was in 10th grade, are you?

"A. No, I'm not.

"Q. So now you've rendered an opinion that he was willing to do the things with his girlfriend and the dog when he fully knew they were wrong, correct, but he wouldn't do them, if he knew they were wrong, to his daughter, is that correct?

"A. That's correct."

{¶ 48} The state also asked Dr. Resnick about appellant's eighth-grade girlfriend on direct. The following discussion took place between the state and Dr. Resnick:

"Q. [Appellant] talked to you, on Page 4 of your report, about a girlfriend he had when he was in 10th grade, and she was in 8th grade.

"A. Yes. [Appellant] described a girl named—first name was [C.], and he—he described having—this was his first serious girlfriend, and it did include a sexual relationship.

"Q. Okay. Did [appellant] talk to—about anything involving a dog with [C.]?

"A. Yes. [Appellant] told me that he was getting ready to break up with [C.], and [C.] desperately wanted to remain in the relationship, and he said he was kind of banking on her affection for him and trying to prove her love for him. He got her to perform sex with a male dog to kind of prove her love, and he talked about that he took pleasure that he did get her to do that, but he went on to break up with her, anyway.

"Q. Did [appellant] indicate that at that time a light switch went on in his brain, and he didn't know what was going on?

"A. No, [appellant] didn't volunteer anything about knowing that that act was wrong.

"Q. Did [appellant] provide you with a coherent reason for why he performed that particular act?

"A. Yes. In other words, I think it was pretty clear that [appellant] got pleasure from observing the sex between a woman and an animal[.]"

{¶ 49} On redirect, the state again asked Dr. Resnick about how appellant coerced his eighth-grade girlfriend to have sex with a dog. The state asked Dr. Resnick: "Does [appellant's] description of making his girlfriend have intercourse with a dog when he was in 10th grade and she was in 8th grade assist you in whether it was an impulse-related desire to do these things?" Dr. Resnick responded:

"Well, when [appellant] manipulated his girlfriend, [C.], into having sex with a dog as a teenager, again there was kind of a conscious pleasure, as he told me

about how he was able to use her affection for him to get her to do what he wanted for his own sexual gratification. Knowing that she found it humiliating, he still did what he wanted, taking advantage of her."

{¶ 50} It is clear that the testimony elicited from Drs. Codispoti and Resnick regarding appellant's eighth-grade girlfriend was for the purpose of appellant's diagnosis, which was pertinent to his affirmative defense of insanity. Furthermore, such testimony was admissible under R.C. 2945.371(J), which provides:

"No statement that a defendant makes in an evaluation or hearing under [R.C. 2945.371(A) to (H)] relating to the defendant's competence to stand trial or to the defendant's mental condition at the time of the offense charged shall be used against the defendant on the issue of guilt in any criminal action or proceeding[.]"

{¶ 51} R.C. 2945.371(J) prohibits the use of statements made during proceedings to determine a defendant's competence to stand trial on the issue of guilt for the crime, but it allows the expert to testify regarding insanity issues. See *State v. Reed* (July 20, 2001), 2d Dist. Nos. 18417 and 18448, 2001 WL 815026. The court in *Reed* further explained:

"The prohibition in the statute is necessary because although the statements made to an examiner by the defendant are hearsay, damaging statements would otherwise be admissible under Evid.R. 804(B)(3), statement against interest, if the statute did not exist. However, statements a defendant made to the examiner that are not statements against interest are inadmissible hearsay." Id. at * 6.

{¶ 52} Pursuant to R.C. 2945.371(J), the only statements made by a defendant to an examiner which are admissible are those statements used to help form the examiner's opinion of the defendant's sanity or competency to stand trial. Id.; see, also, *State v. Mathes* (June 13, 2001), 9th Dist. No. 20225, 2001 WL 651527, citing *State v. Cooey* (1989), 46 Ohio St.3d 20, 32, 544 N.E.2d 895 (holding that defendant's statements made during an evaluation were admissible because they went solely to the defendant's mental state at the time of the criminal act). Such statements include statements a defendant makes during a court-ordered psychological examination that can be used to refute the defendant's assertion of mental incapacity, *Cooey*, 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph two of the syllabus, and to impeach credibility in related testimony. *State v. Pohlable* (June 2, 1983), 2d Dist. No. 82CA60, 1983 WL 2453, at * 1–3, 1983 Ohio App. LEXIS 12140, at * 3–4.[5]

---

5. In *Cooey*, the court addressed R.C. 2945.39(D), which was recodified in R.C. 2945.371(J) and which became effective on July 1, 1997. R.C. 2945.39(D), stated: "No statement made by a defendant in an examination or hearing relating to his mental condition at the time of the

{¶ 53} In the case sub judice, Dr. Resnick testified that he used the information concerning appellant's eighth-grade girlfriend to determine whether appellant was insane at the time he committed the criminal acts or whether appellant was attempting to fake his insanity and was in reality malingering. By showing that appellant was malingering, rather than suffering from insanity, the state wanted to show that appellant knew what he was doing when he forced his daughter to have sex with the family dog. Dr. Codispoti's testimony added to the state's alternative diagnosis of malingering because she testified that appellant coerced his eighth-grade girlfriend to have sex with a dog because he wanted to manipulate her for his own purposes, and that one who is able to manipulate another knows that what he is doing is wrong. Based on the state's argument that appellant was malingering, logic would dictate that when appellant asked his daughter to perform the same act with the family dog, that he was also attempting to manipulate her, and that he knew, at the moment that he forced her to have sex with the dog, the wrongfulness of his actions.

{¶ 54} Because Drs. Resnick's and Codispoti's testimony did not relate to appellant's guilt, but rather to his mental state, appellant has failed to demonstrate that the state did not comply with R.C. 2945.371(J). Therefore, it was not error for the state to question the experts about appellant's past sexual conduct with his then eighth-grade girlfriend, and thus the state did not commit prosecutorial misconduct. Furthermore, viewed in the context of the entire trial, it cannot be said that the prosecutor's actions denied appellant a fair trial or that his substantial rights were prejudicially affected. As such, appellant has failed to prove the first prong of the plain error analysis or that this is such an egregious case that it warrants reversal to prevent a manifest miscarriage of justice. Appellant's fourth assignment of error lacks merit.

### III

{¶ 55} Appellant's assignments of error are overruled. The judgment of the trial court is affirmed.

Judgment affirmed.

BAIRD, P.J., and CARR, J., concur.

---

commission of an offense shall be used in evidence against him on the issue of guilt in any criminal action." The language contained in former R.C. 2945.39(D) is substantially the same as R.C. 2945.371(J), and this court has held that *Cooey* is still applicable to cases dealing with R.C. 2945.371(J). *State v. Mathes* (June 13, 2001), 9th Dist. No. 20225, 2001 WL 651527.