DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Michele Stekelenburg ("Stekelenburg"), appeals the judgment of the Summit County Court of Common Pleas, which found her guilty of multiple counts of using deception to obtain a dangerous drug, multiple counts of possession of a dangerous drug, and one count of possession of heroin. This Court affirms in part, and reverses in part.
 I. {¶ 2} On June 8, 2007, Stekelenburg was indicted on ten counts. The first seven counts were separate counts for deception to obtain a dangerous drug in violation of R.C. 2925.22, felonies of the fifth degree. The last three counts were separate counts for possession of a dangerous drug in violation of R.C. 4729.51(C)(3), felonies of the fifth degree. On June 25, 2007, Stekelenburg was arraigned, and pleaded not guilty to all of the counts in the indictment.
 {¶ 3} On November 27, 2007, Stekelenburg filed a motion for leave to withdraw her plea of not guilty, and enter a plea of not guilty by reason of insanity. On December 5, 2007, the *Page 2 
trial court, by journal entry, ordered that Stekelenburg would be permitted to withdraw her earlier plea, and enter a plea of not guilty by reason of insanity.
 {¶ 4} On April 7, 2008, a supplemental indictment was filed containing one additional count of possession of heroin in violation of R.C. 2925.11(A)(C)(6), a felony in the fifth degree. The count in the supplemental indictment stemmed from events which occurred on February 28, 2008, when Stekelenburg was found unconscious on the floor of a Walgreen's bathroom, and was taken to the hospital. While at the hospital, in going through Stekelenburg's belongings, hospital security found Ambien pills for which Stekelenburg had a prescription, as well as a powdery white substance wrapped in a tissue in a compartment of her bra.
 {¶ 5} On April 23, 2008, Stekelenburg was arraigned on the single count in the supplemental indictment, to which she pleaded not guilty. On May 16, 2008, Stekelenburg filed a motion for leave to withdraw her plea of not guilty on count 11 of the supplemental indictment, and enter a plea of not guilty by reason of insanity. The record does not clearly show whether the trial court granted this motion.
 {¶ 6} On June 3, 2008, Stekelenburg voluntarily waived her right to a jury trial, and trial commenced. On June 6, 2008, after hearing the evidence and arguments from both parties, the trial court entered a verdict finding Stekelenburg guilty of all charges in the eleven counts of the indictment and supplemental indictment. The trial court also found "that the defense failed to prove by a preponderance of the evidence the affirmative defense of Not Guilty by Reason of Insanity[,]" and sentenced Stekelenburg to a total of 24 months in the Ohio State Reformatory for Women. Stekelenburg timely appeals setting forth three assignments of error. *Page 3 
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT'S DETERMINATION THAT THE EVIDENCE WAS IN EQUIPOISE AND THEREFORE, THAT THE DEFENDANT FAILED TO PROVE HER ENTITLEMENT TO A NOT GUILTY BY REASON OF INSANITY DEFENSE, WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 7} Stekelenburg argues that the trial court's determination that she failed to prove that she was not guilty by reason of insanity beyond a preponderance of the evidence was against the manifest weight of the evidence. This Court disagrees.
 {¶ 8} When determining whether a conviction is against the manifest weight of the evidence, this Court has held that courts of appeal:
 "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' State v. Otten (1986), 33 Ohio App.3d 339, 340." State v. Worrell, 9th Dist. Nos. 23378, 23409, 2007-Ohio-7058, at ¶ 11.
However, "`[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Bethel, 110 Ohio St.3d 416,2006-Ohio-4853, at ¶ 100, quoting State v. Martin (1983),20 Ohio App.3d 172, 175.
 {¶ 9} The plea of not guilty by reason of insanity is an affirmative defense. State v. Latham, 9th Dist. No. 07CA0067-M, 2008-Ohio-3050, at ¶ 16, citing State v. Armstrong, 152 Ohio App.3d 579, 2003-Ohio-2154, at ¶ 16. "The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused." R.C. 2901.05(A). *Page 4 
 {¶ 10} "A person is `not guilty by reason of insanity' relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14). Finally, "[p]roof that a person's reason, at the time of the commission of an offense was so impaired that the person did not have the ability to refrain from doing the person's act or acts, does not constitute a defense." (Internal citations and quotations omitted). Armstrong at ¶ 16.
 {¶ 11} Here, Stekelenburg presented one expert witness to bolster her affirmative defense of not guilty by reason of insanity. Stekelenburg called Dr. Clifford Perera, a board certified psychiatrist with extensive experience involving court determinations of not guilty by reason of insanity. Dr. Perera testified that he had worked at Fallsview Psychiatric Hospital for over seventeen years and participated in numerous court hearings for commitment.
 {¶ 12} Dr. Perera testified that he began treatment of Stekelenburg on August 2, 2007, which lasted through February of 2008. Dr. Perera also provided that he diagnosed Stekelenburg with bipolar disorder with rapid cycling moods. Dr. Perera testified that he based his diagnosis on multiple factors. The first factor was Stekelenburg's pre-morbid history. This history included Stekelenburg's suffering from symptoms of depression and hypomania as an adolescent and young adult, the prior occurrence of depressive episodes with suicidal feelings, and her suffering from postpartum depression which Dr. Perera alleged is suffered by approximately fifty percent of mothers with bipolar disorder. Also included as a part of Stekelenburg's pre-morbid history considered by Dr. Perera was Stekelenburg's family history of mental disease including one cousin with a similar mood disorder, and a grandmother with a mood disorder. Dr. Perera also noted Stekelenburg's, at times, grandiose and impulsive behavior. *Page 5 
 {¶ 13} Dr. Perera testified that he also considered Stekelenburg's mental status at the time of his diagnosis. He testified that Stekelenburg was "extremely labile in her moods, scattered flight ideas, rapid pressured speech, poor insight, reality * * * ." In addition, Dr. Perera pointed to Stekelenburg's past substance abuse, which he testified occurs in over fifty percent of those suffering from bipolar disorder. Dr. Perera testified that he believed that all of the above mentioned symptoms were consistent with diagnosis of bipolar disorder. Ultimately, Dr. Perera opined that due to the impairment in judgment and cognitive function caused by bipolar disorder, Stekelenburg could not appreciate the wrongfulness of her conduct during the time period in which she committed the acts for which she was charged.
 {¶ 14} The State provided two expert witnesses to rebut the testimony of Dr. Perera's conclusion that Stekelenburg did not appreciate the wrongfulness of her actions when carrying out the actions for which she was charged.
 {¶ 15} The first expert called by the State was Dr. Kathleen Stafford. At trial, Dr. Stafford testified that she was the director of the court Psychodiagnostic Clinic in Summit County. Dr. Stafford also testified that she is board certified in forensic psychology and had completed a variety of training and publishing in the area of forensic psychology.
 {¶ 16} After reviewing a number of different sources, including Stekelenburg's medical history, her previous evaluation by the Psychodiagnostic Clinic from Stekelenburg's first conviction on similar charges, her educational history, and the report of Dr. Perera, Dr. Stafford conducted an independent evaluation of Stekelenburg.
 {¶ 17} Dr. Stafford testified that she did not diagnose Stekelenburg with bipolar disorder, but rather with "an adjustment disorder with mixed anxiety and depressed mood," an "opiate dependence reportedly in early full remission," and "substance-induced mood disorder with *Page 6 
mixed features by history [.]" Stafford noted that the correct procedure in conducting insanity evaluations is to first determine whether the person is suffering from a severe mental disease or defect at the time of the alleged offenses and then to determine whether that disease or defect caused the person to be unable to appreciate the wrongfulness of the acts for which she is charged. After explaining the applicable procedure, Dr. Stafford testified that it was her "opinion that at the time of the acts charged [Stekelenburg] was not suffering from a severe mental disease or defect."
 {¶ 18} Dr. Stafford also testified that she did not agree with Dr. Perera's diagnosis of bipolar disorder because Stekelenberg had "not displayed symptoms of major mood disorder independent of using substances." Dr. Stafford further testified that even if Stekelenburg was in fact suffering from bipolar disorder at the time of the alleged actions that she still would not fall under the criteria for insanity. Specifically, Dr. Stafford explained that a link would have to be made between the bipolar diagnosis and the alleged lack of understanding of the wrongfulness of her actions, and then testified that "[i]t would be very rare for an individual to have a reported course of criminal conduct over time that was the result of lack of knowledge of the wrongfulness of that conduct."
 {¶ 19} Dr. Stafford also testified that "much [has been] written in the literature about the problems of becoming a forensic clinician when one has been in a treatment role with a patient." When asked if it is contrary to the standards of her profession for treating physicians to render opinions involving the issue of not guilty by reason of insanity, Dr. Stafford eventually provided that she believed that treating physicians "might take an advocacy role for his patient" and that might hinder his ability to address an issue such as sanity at the time of the act in question. *Page 7 
 {¶ 20} The second expert called by the state was Dr. Stephen Noffsinger. Dr. Noffsinger testified that he was the "chief of forensic [psychiatry] at North Coast Behavior Healthcare, which is a state run psychiatric hospital in Northfield [,]" and that he also worked for the "Court of Common Pleas in Cleveland half day a week working for the court psychiatric clinic there." Dr. Noffsinger testified that he had previously completed a one year fellowship in forensic psychiatry, and had completed between seven hundred and one thousand not guilty by reason of insanity evaluations.
 {¶ 21} In coming to his diagnosis and conclusion, Dr. Noffsinger testified that he "looked at a number of records" including police records, medical records and evaluations, court records, and the reports of Dr. Perera and Dr. Noffsinger. After review of the above mentioned material and conducting an independent evaluation, Dr. Noffsinger diagnosed Stekelenburg with "Ultram or opiate dependence, Ambien abuse, and substance-induced mood disorder." Ultimately, Dr. Noffsinger testified that he found that Stekelenburg "would not qualify as not guilty by reason of insanity." Dr. Noffsinger testified that he believed Stekelenburg did not qualify because there was active abuse and dependence on the drugs at the time of the offenses, and because of that dependence a diagnosis such as bipolar disorder could not be made. Furthermore, Dr. Noffsinger felt that Stekelenburg did not qualify because of her knowledge of the wrongfulness of her actions. Dr. Noffsinger testified at trial that "[Stekelenburg] would not have had a severe mental disease or defect during the offense which caused her to not know the wrongfulness because she told me she knew it was illegal."
 {¶ 22} Dr. Noffsinger also testified that he agreed with the assessment of Dr. Stafford, but disagreed with the opinions and conclusions of Dr. Perera. Specifically, Dr. Noffsinger testified that he did not believe that Dr. Perera had the qualifications to perform such an *Page 8 
evaluation, that he disagreed with the procedures Dr. Perera used in coming to his conclusions, that he disagreed with the diagnoses of Dr. Perera, and that he disagreed with Dr. Perera's assessment that Stekelenburg was not guilty by reason of insanity because Dr. Perera failed to identify any of the specific symptoms of bipolar disorder that would cause Stekelenburg to not know the wrongfulness of her actions.
 {¶ 23} Echoing the sentiments of Dr. Stafford, when asked whether he believed a treating physician should conduct a sanity evaluation, Dr. Noffsinger testified that he did not believe one should. Dr. Noffsinger provided three reasons in support of his theory which include: (1) a treating physician generally tends to be biased to his patient's interest; (2) it could hinder the doctor/patient relationship if the doctor rendered an opinion adverse to the patient; and (3) most treating psychiatrists have not been properly trained in conducting sanity evaluations.
 {¶ 24} The trial court, after finding beyond a reasonable doubt that "each and every element of each of the crimes charged in Counts One through 11 and makes findings of guilty with respect to those charges[,]" addressed Stekelenburg's defense of not guilty by reason of insanity. In coming to its conclusion, the trial court stated:
 "The Court does not believe that an act committed under the stress or emotion, whether as a result of state of mind, could be bipolar, circumstance, however strong and apparently uncontrollably, would not be an excuse for an offense by a person not otherwise insane as previously decided in this particular case."
Furthermore, after recognizing that "there was competent and adequate professional testimony on the issue of not guilty by reason of insanity that was provided by both sides[,]" the trial court found:
 "The court, however, does not believe that the burden of proof of a preponderance based upon the fact that the court does not have to make a determination as to whether to believe one side or the other, but I think that there was minimally an equal balance between the testimony, minimally, to require the court to make a *Page 9 
finding that the not guilty by reason of insanity would not be a defense in this particular case and makes a judgment in that regard."
Ultimately, the trial court concluded "that the defense of not guilty by reason of insanity is not valid in this particular case."
 {¶ 25} In the case before this Court, Stekelenburg argues that the trial court erred in denying her defense of not guilty by reason of insanity. More specifically, Stekelenburg argues that the trial court failed to resolve which party's evidence was more persuasive because the "trial court below indicated that the evidence on the sanity issue was in `equal balance' with both sides presenting competent evidence." However, while the trial court noted that there was "minimally an equal balance between the testimony," the court went on to explain that because of that the court was required to make a ruling that not guilty by reason of insanity was not valid in the case at hand because Stekelenburg failed to meet her burden.
 {¶ 26} After a thorough review of the record, weighing the evidence and all reasonable inferences, considering the credibility of witnesses, and resolving the conflicts in the evidence, this Court cannot say that "the trier of fact clearly lost its way and created such a manifest miscarriage of justice" which would warrant the reversal of trial court's findings. There was more than adequate evidence in the record to support the trial court's findings. The State provided the testimony of two well-known mental health professionals who were both highly qualified in the area of not guilty by reason of insanity evaluations, and both found that Stekelenburg had substance induced mood disorder and knew the wrongfulness of her actions. Therefore, the trial court's finding that Stekelenburg's defense of not guilty by reason of insanity was not valid in this case was not against the manifest weight of the evidence. Accordingly, Stekelenburg's first assignment of error is overruled. *Page 10 
 ASSIGNMENT OF ERROR II "[STEKELENBURG'S] CONVICTION FOR COUNT ELEVEN (11) OF THE INDICTMENT WAS NOT SUBSTANTIATED BY THE EVIDENCE."
 {¶ 27} Stekelenburg argues that her conviction for possession of heroin was against the manifest weight of the evidence. This Court disagrees.
 {¶ 28} This Court's standard of review for manifest weight of the evidence challenges is set forth in assignment of error I.
 {¶ 29} In count 11, Stekelenburg was charged with possession of heroin in violation of R.C. 2925.11(A)(C)(6). Pursuant to R.C. 2925.11(A), "[n]o person shall knowingly obtain, possess, or use a controlled substance[,]" and according to R.C. 2925.11(C)(6), "[i]f the drug involved in the violation is heroin * * *, whoever violates division (A) of this section is guilty of possession of heroin." In addition, "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Furthermore, "[possession is a voluntary act if the possessor knowingly procured or received the thing possessed[.]" R.C. 2901.21(D).
 {¶ 30} John Catalano, a security guard at Akron General Medical Center's Health and Wellness Center in Stow, Ohio, testified that he was on duty the night of February 28, 2008, when Stekelenburg was brought in for medical treatment. Catalano testified that "per our protocol from the hospital system we received her personal effects" and found around "two dozen" Ambien pills as well as a substance in "chalky powder form" in a "compartment" in the bra that Stekelenburg was wearing when she was admitted. Catalano also testified that hospital security contacted the Stow Police, and then gave the items to Officers Dirker and Green when they arrived. *Page 11 
 {¶ 31} Officer Erik Dirker, a police officer employed by the city of Stow, testified at trial about the events that took place February 28, 2008, and the subsequent investigation of those events. Dirker testified that the powder obtained from Stekelenburg's bra was tested by the Bureau of Criminal Identification, and was found to be heroin. Dirker also testified that he interviewed Stekelenburg about the events that took place on February 28. Dirker testified that during the interview, Stekelenburg gave a history of her problems starting with her former job at the Beacon Journal, proceeding through an accident she was in after which she began to first use Ultram, and ending with her treatment from Dr. Perera. Dirker further testified that Stekelenburg explained that on the night of February 28, she had attended a Narcotics Anonymous ("NA") meeting and that "one gentleman told her that he got something that could make her feel better." Dirker specified that Stekelenburg did not indicate whether or not she physically received the substance; however, he testified that she said that another individual from the NA meeting called her and told her to "[l]ook in your purse, we left you something[.]" Dirker testified that Stekelenburg said that she located the substance, tasted it, and found that "it tasted gross[.]" Dirker also testified that Stekelenburg said that after she tasted the powder, she wrapped it in toilet paper, "but couldn't recall what she did with it."
 {¶ 32} During Stekelenburg's testimony, she was asked: "To the best of your knowledge is what Detective Dirker, what you told him happened, is that your best recollection of what happened?" Stekelenburg replied affirmatively. Later, when asked "was [Officer Dirker's] rendition or summary of your statement correct[,]" Stekelenburg replied: "Everything but one thing." Stekelenburg testified that she specifically remembered telling Officer Dirker that she was going to throw the "bad tasting stuff in the toilet. Futhermore, when asked if she knew *Page 12 
"what the substance was in — that was found in your bra[,]" Stekelenburg testified that she had "no idea what that was."
 {¶ 33} The trial court found "that while the testimony of the Defendant was that she received something from somebody at an NA meeting, not admitting that she knew it was heroin, the court believes that she understood it was something that was inappropriate." The court further stated that Stekelenburg took control over the heroin, that she sampled the substance, and then hid it in her bra. Ultimately, the court concluded that based on the totality of the circumstances, that every element of the crime in count 11 had been established beyond a reasonable doubt.
 {¶ 34} Stekelenburg now argues that there was no proof offered of Stekelenburg's knowledge of the heroin found in her bra outside of the testimony of Officer Dirker, and because of that, "the Prosecution did not prove beyond a reasonable doubt that [Stekelenburg] knowingly possessed heroin on February 28, 2008."
 {¶ 35} However, after a review of the evidence and testimony in this case, this Court cannot say that the trial court clearly lost its way in finding Stekelenburg knowingly possessed heroin. The testimony in this case shows, and Stekelenburg affirms, that she possessed the heroin in question after an individual from NA told her it would make her feel better, she orally ingested some of the substance, and then proceeded to place it in her bra, presumably to conceal the heroin. Furthermore, this Court has found that concealment is evidence of a consciousness of guilt. State v. Jones, 9th Dist. No. 23875, 2008-Ohio-5443, at ¶ 30, citing State v. Harris, 9th Dist. No. 22466, 2005-Ohio-4935, at ¶ 17. In light of the above, there is adequate evidence in the record from which the trial court could find that Stekelenburg knowingly possessed the heroin in question. Therefore, this Court cannot say that the trial court clearly lost its way and created a *Page 13 
manifest miscarriage of justice warranting reversal of its finding of guilt. Accordingly, Stekelenburg's second assignment of error is overruled.
 ASSIGNMENT OF ERROR III "[STEKELENBURG'S] CONVICTION FOR COUNTS EIGHT (8) THROUGH TEN (10) OF THE INDICTMENT ARE BASED UPON AN UNLAWFULLY EXPANSIVE INTERPRETATION OF REVISED CODE SECTIONS 4729.51(C)(3) AND 3719.09(C)."
 {¶ 36} Stekelenburg argues that the trial court erred in finding she was guilty of possession of a dangerous drug when she possessed the drugs pursuant to a prescription provided by a medical health professional. This Court agrees.
 {¶ 37} In the case at hand, Stekelenburg was found guilty of three counts of possession of a dangerous drug. R.C. 4729.51(C)(3) is the statute that prohibits such behavior and provides: "Except as provided in division (C)(4) of this section, no person shall possess dangerous drugs." Section (C)(4) of R.C. 4729.51 provides that "[divisions (C)(1), (2), and (3) of this section do not apply to * * * a person who possesses * * * a dangerous drug in accordance with Chapter[] 3719 * * * of the Revised Code." R.C. 3719.09 provides:
 "Possession or control of controlled substances is authorized in the following instances and subject to the following conditions:
 "(C) Possession by any person of any controlled substance that the person obtained pursuant to a prescription issued by a licensed health professional authorized to prescribe drugs or that was obtained for the person pursuant to a prescription issued by a prescriber, when the drug is in a container regardless of whether the container is the original container in which the drug was dispensed to that person directly or indirectly by a pharmacist or personally furnished to that person by the prescriber[.]"
 {¶ 38} Stekelenburg argues that since she had a prescription issued by a licensed health professional she could not be convicted of possession of a dangerous drug. She acknowledges that she could be convicted for deception to obtain the drugs. The prosecution argues that the statute implicitly requires the prescription to have been obtained lawfully. However, nothing in *Page 14 
R.C. 4729.51 or R.C. 3719.09 requires that the drugs be obtained without deception in order to fall under the exception in R.C. 3719.09. The only prerequisite for the exception is that the prescription be "obtained pursuant to a prescription issued by a licensed health professional authorized to prescribe drugs[.]"
 {¶ 39} This issue has been addressed in regard to a different drug possession statute, R.C. 2925.11. In State v. Casshie, 8th Dist. No. 81341, 2002-Ohio-6514, the appellant obtained the drugs in question from a licensed health professional through the use of deception. In coming to its conclusion, the trial court considered R.C. 1.47 which makes clear that the legislature presumably intends for a just result when an enactment is made. The trial court also considered the strictures of R.C. 2901.04(A) which requires that "sections of the Revised Code defining offenses or penalties shall be strictly construed against the State, and liberally construed in favor of the accused." Id. The court then noted that it was "uncontroverted that the defendant `knowingly possessed, or used a controlled substance' but, as stated, the statute's exception * * * clearly precludes prosecution since the prescriptions were issued by licensed health professionals authorized to prescribe drugs." Casshie at ¶ 17. The exception in question reads: "(B) This section does not apply to any of the following: * * * (4) Any person who obtained the controlled substance pursuant to a lawful prescription issued by a licensed health professional authorized to prescribe drugs." R.C. 2925.11(B)(4).
 {¶ 40} Ultimately, the court in Casshie concluded:
 "Under the current wording of R.C. 2925.11, the state is precluded from seeking an indictment charging aggravated possession of drugs against individuals that knowingly deceive a physician in obtaining a prescription for a controlled substance because of the statutory exemptions. Understandably, this court would urge the legislature to revisit this issue and clearly make the distinction between lawfully obtained prescriptions and those prescriptions that were obtained utilizing deceptive and deceitful practices." Id. at ¶ 18. *Page 15 
 {¶ 41} In the case at hand, although Stekelenburg was charged under a different statute in this particular charge, the same issue is presented. As under R.C. 2925.11, the interrelation between R.C. 4729.51
and R.C. 3719.09 require only that the prescription be "obtained pursuant to a prescription issued by a licensed health professional authorized to prescribe drugs[,]" but does not require that prescriptions be obtained lawfully and without deception to fall under the exception provided by the statute. Here, as was the situation inCasshie, even though the drugs in questions were obtained through deception, the drugs were acquired through prescriptions from licensed health professionals. Therefore, because the current version of R.C. 3719.09 does not differentiate between prescriptions obtained utilizing deception and those obtained lawfully, Stekelenburg cannot be convicted of possession of dangerous drugs. Accordingly, Stekelenburg's third assignment of error is sustained.
 III. {¶ 42} Stekelenburg's first and second assignments of error are overruled. Stekelenburg's third assignment of error is sustained. The judgment of the Summit County Court of Common Pleas is affirmed in part, and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.
Judgment affirmed, in part, reversed, in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27. *Page 16 
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed equally to both parties.
DICKINSON, P. J. CONCURS
SLABY, J. CONCURS IN JUDGMENT ONLY *Page 1