DECISION AND JOURNAL ENTRY
{¶ 1} Defendant/Appellant, Steven M. Latham, appeals his conviction for felonious assault in the Medina County Court of Common Pleas. We affirm.
 {¶ 2} Defendant was indicted on four counts of felonious assault in violation of R.C. 2903.11(A)(2)(D), felonies of the first degree with firearm specifications in violation of R.C. 2941.145 stemming from an incident on September 7, 2006, during which Defendant shot a handgun at police in the backyard of his home in Medina County. Defendant pled not guilty to the charges by reason of insanity. Beginning on April 24, 2007, Defendant was tried to a jury and was found guilty as charged. Defendant was sentenced to twenty-seven years in prison.
 {¶ 3} Defendant timely appealed his conviction and raises four assignments of error. For ease of discussion, we have rearranged Defendant's assignments of error.
 Assignment of Error III "The court erred in permitting expert testimony based upon hearsay statements and facts not entered into the trial record in violation of Ohio Evid. Rule 703." *Page 2 
 {¶ 4} Defendant asserts that the trial court violated Evid. R. 703 by permitting the State's expert, Dr. Stephen Noffsinger, to give his opinion as to whether Defendant suffered from a mental disease or defect and knew the wrongfulness of his conduct on the date of the shooting, when such opinion was based on materials that were hearsay and/or not admitted into evidence. Defendant further maintains that the trial court erred in allowing Dr. Noffsinger to testify that Defendant's psychosis was cannabis-induced when such opinion was based solely on statements from Defendant and others, as well as records not admitted into evidence. Defendant specifically lists 22 such items upon which Dr. Noffsinger relied.
 {¶ 5} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Harmon, 9th Dist. No. 22399, 2005-Ohio-3631, at ¶ 13, citing State v. Ditzler (Mar. 28, 2001), 9th Dist. No. 00CA007604, at *5. "Therefore, unless the trial court has abused its discretion and the appellant has been materially prejudiced by the admission, this Court will not interfere." Harmon at ¶ 13. "Abuse of discretion connotes more than simply an error in judgment; the court must have acted in an unreasonable, arbitrary, or unconscionable manner." Id. citing Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219.
 {¶ 6} "It is well established that a party may not, upon appeal, raise a claim that the testimony of an expert witness was defective, unless that party objected thereto at trial." Beckman v. Yellow FreightSystems, Inc. (Feb. 12, 1997), 9th Dist. No. 17845, at *3, citingStores Realty Co. v. Cleveland (1975), 41 Ohio St.2d 41, 43. By failing to challenge Dr. Noffsinger's opinion testimony at trial, Defendant forfeited the right to appeal on that ground. Beckman at *3. See, alsoIn re Stillman (2003), 155 Ohio App.3d 333, 2003-Ohio-6228, at ¶ 64
(holding that appellant waived any challenge to expert testimony based heavily on hearsay reports when appellant failed to object to the testimony in the trial court); State v. Blair (1990), *Page 3 70 Ohio App.3d 774, 790 (holding that failure to object to expert witness's testimony, which was allegedly inadmissible hearsay in that it was based upon report prepared by other scientists, waived any potential error on that basis).
 {¶ 7} Defendant did not object to Dr. Noffsinger's consideration of any materials in rendering his opinion. Defense counsel objected five times to Dr. Noffsinger's direct testimony. Two objections occurred at pages 624 and 629 of the transcript and appear to challenge Dr. Noffsinger's ability to make legal conclusions. Defense counsel also objected at pages 635 and 638 of the transcript to Dr. Noffsinger's testimony as to his conclusions after reviewing Alternative Path and jail records, but only as to a potential violation of attorney/client privilege. The only objection made that could be deemed to be challenging documents upon which Dr. Noffsinger relied in rendering his opinion was an objection to an article from Journal of The American Academy of Psychiatry and the Law referenced at page 653 of the transcript and this article is not one of the items listed in Defendant's brief as being a material upon which Dr. Noffsinger improperly relied.
 {¶ 8} Defendant never objected to the basis of Dr. Noffsinger's testimony and, thus, has forfeited all but plain error. See State v.Eagle, 9th Dist. No. 04CA0003, 2004-Ohio-3255, at ¶ 22, citing Crim. R. 52(B) and State v. Baston (1999), 85 Ohio St.3d 418, 423. "Plain error is defined as any error or defect that affects an individual's substantial rights, which is not brought to the attention of the trial court through an objection." In re L.A.B., 9th Dist. No. 23309,2007-Ohio-1479, at ¶ 19. However, Defendant has neither argued plain error, nor has he "explained why we should delve into either of these issues for the first time on appeal. Accordingly, we decline to address these issues." Id.
 {¶ 9} Defendant's third assignment of error is overruled. *Page 4 
 Assignment of Error I "Each conviction for felonious assault was against the manifest weight of the evidence and based upon insufficient evidence as to the element of knowingly."
 Assignment of Error II "[Defendant] satisfied the burden of his affirmative defense of not guilty by reason of insanity."
 {¶ 10} In his first two assignments of error, Defendant asserts that his conviction was against the manifest weight of the evidence and was not supported by sufficient evidence that he acted knowingly because he demonstrated that he was not guilty by reason of insanity.
 {¶ 11} We review a trial court's denial of a Crim. R. 29 motion by assessing the sufficiency of the evidence "to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. To make this determination, we view the evidence in the light most favorable to the prosecution. Id.; State v. Feliciano (1996), 115 Ohio App.3d 646, 653. "In essence, sufficiency is a test of adequacy." State v.Thompkins, 78 Ohio St.3d 380, 386.
 {¶ 12} "While the test for sufficiency requires a determination of whether the [S]tate has met its burden of production at trial, a manifest weight challenge questions whether the [S]tate has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citing Thompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). If a defendant asserts that his conviction is against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340. *Page 5 
This discretionary power should be invoked only in extraordinary circumstances if the evidence presented weighs heavily in favor of the defendant. Id. Since sufficient evidence is required to take the case to the jury, if a conviction is supported by the weight of the evidence it necessarily is supported by sufficient evidence. State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2.
 {¶ 13} Based on a review of the record, this Court finds it reasonable that the jury could have believed the testimony and evidence proffered by the State, convicted Defendant of felonious assault against a peace officer, and declined to believe that Defendant was suffering from a mental illness or defect that caused him not to know the wrongfulness of his actions at the time of the shooting. The jury heard the testimony of 17 witnesses on behalf of the State and five on behalf of Defendant. Defendant did not testify.
 {¶ 14} Defendant was convicted of felonious assault in violation of R.C. 2903.11(A)(2) and (D)(1), which state:
 "(A) No person shall knowingly do either of the following:
 * * *
 "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.
 * * *
 "(D)(1) * * * If the victim of a violation of division (A) of this section is a peace officer or an investigator of the bureau of criminal identification and investigation, felonious assault is a felony of the first degree. If the victim of the offense is a peace officer or an investigator of the bureau of criminal identification and investigation, and if the victim suffered serious physical harm as a result of the commission of the offense, felonious assault is a felony of the first degree, and the court, pursuant to division (F) of section 2929.13 of the Revised Code, shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the first degree." *Page 6 
 {¶ 15} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).
 {¶ 16} "A person is `not guilty by reason of insanity' relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14). "Proof that a person's reason, at the time of the commission of an offense, was so impaired that the person did not have the ability to refrain from doing the person's act or acts, does not constitute a defense." R.C. 2945.391. Finally, it is an affirmative defense to plead not guilty by reason of insanity. State v.Armstrong, 152 Ohio App.3d 579, 2003-Ohio-2154, at ¶ 16. "The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused." R.C. 2901.05(A). See, also, State v.Filiaggi (1999), 86 Ohio St.3d 230, 242.
 {¶ 17} We note that, "[pursuant to R.C. 2901.21(C), `[v]oluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense.'"State v. Inman, 9th Dist. No. 03CA0099-M, 2004-Ohio-1420, at ¶ 7, quoting R.C. 2901.21(C).
 {¶ 18} Officer Siebert was a deputy sheriff employed by the Medina County Sheriffs Department ("Sheriffs Department") who responded with Deputy Steve Clark to Defendant's address at 9845 Crow Road (the "scene") on September 7, 2006. Siebert explained that he and Clark responded to a "threat of suicide complaint" from Defendant's friend, Mark Brummer. *Page 7 
Siebert stated that Brummer told them that Defendant was "distraught" and had asked Brummer to leave the property. Another friend of Defendant's family, Jeff Jackson, told them that Defendant "had been partaking in antigovernment classes." Siebert also explained that Brummer told them that Defendant had asked about how police might approach his property if they needed to do so. Siebert indicated that because of Brummer's and Jackson's statements, the officers felt they needed to approach the scene with caution. Siebert testified that on their way to the scene, radio traffic indicated that Defendant had set his four-wheeler on fire. Siebert indicated that he also learned that Defendant owned rifles and shotguns
 {¶ 19} Siebert testified that he, Clark, deputies Harhay and Schmoll devised a plan as to how to approach the property. Siebert explained that Harhay went into the woods behind the property with binoculars and fed them information as to Defendant's activities. Siebert stated that Harhay reported that Defendant was in the backyard throwing things from his house into a fire. Siebert testified the officers parked their cars two houses east of the property and approached the southeast corner of the garage on foot. Siebert explained that they had been trained, because of the information they had received about Defendant's anti-government tendencies, to "go in as covert as possible." Siebert testified that the officers' intent was to check on Defendant and get him some psychological help.
 {¶ 20} Siebert testified that upon learning from Harhay that Defendant was at the fire empty-handed, he initiated a dialogue from a hill near the corner of the garage. Siebert stated that he began the conversation by telling Defendant that police had received a "burning complaint." Siebert testified that Defendant responded in an agitated manner, telling him, "I'm a free man. I'll burn what I want." Siebert stated that Defendant continually asked police to leave the property. Seibert explained that the officers backed away from the scene when Defendant *Page 8 
walked towards the fire where several gas cans were sitting. Siebert explained that he continued to ask Defendant if he could get him some professional help and Defendant continued to order them off his property. Siebert stated that Defendant did not appear intoxicated.
 {¶ 21} Siebert testified that when Defendant put his hand in his pocket, Siebert ordered him to remove it, but Defendant refused to do so. Seibert explained that he then drew his taser. Siebert testified that he was temporarily distracted by other officers' movement at the scene and when his eyes returned to Defendant he saw Defendant pointing something at him. Siebert stated that he dropped to the ground and that Defendant fired his gun. Siebert indicated that he responded by discharging his taser. Siebert testified that Defendant started to yell indicating he had been hit by the taser dart, but continued pointing the gun at him. Siebert believed Defendant had removed the taser dart. Siebert testified that Defendant fired his gun again at him and Harhay, looking directly at Harhay as he did so. Siebert stated that Defendant then fled while continuing to fire his gun at Michalak and backwards at Clark and himself. Siebert indicated that he chased Defendant and noticed Harhay holding his neck and bleeding. Siebert testified that Defendant continued to shoot at Michalak, and Siebert shot Defendant in the back, after which Defendant fell but got up again. Siebert explained that he then fired his final shot at Defendant's hip and Defendant fell but still held on to his gun. Defendant continued to refuse to drop his gun but eventually did so and was cuffed, Mirandized, and arrested. Siebert stated that Defendant was focused and looking in the direction in which he was firing his gun each time he pulled the trigger. Siebert stated that sometime during the events, he called for an ambulance as did others.
 {¶ 22} Siebert finally testified that after he was arrested, Defendant told the officers that he shot at them because he wanted them off his property and only stopped shooting because he *Page 9 
ran out of bullets. Siebert identified the gun and Defendant as well as various photographs of the scene.
 {¶ 23} Officer Michalak was employed by the Sheriffs Department on September 7, 2006, and responded to the scene to "make contact with a male and make sure that he was okay and, if need be, have him transported to the hospital." Michalak explained that the dispatch call indicated that Defendant was possibly suicidal. Michalak's testimony of the events at the property supported that of Siebert. Michalak also noted that he drew his taser when Defendant refused to take his hand out of his pocket at Siebert's request and exchanged gun fire with Defendant when Defendant fired at him and the other officers. Michalak noted that the officers were wearing street clothes or uniforms and did not have on SWAT team clothing. Michalak finally testified as to Harhay's gun shot injuries based on his training as an EMT. Michalak identified Defendant, the gun he used, and a diagram of the scene.
 {¶ 24} Deputy Harhay was employed by the Sheriffs Department on September 7, 2006, and responded to the scene. Harhay's testimony supported that of Siebert. Harhay additionally noted that Brummer told the officers that, Defendant "was very anti-government and disgruntled against the police and government" and that he had guns at his home. Harhay noted that he did not see Defendant with a gun prior to the shooting. Harhay indicated that the only thing he heard Defendant say during the entire altercation was, "[g]et off my property." Harhay testified that after the initial exchange between Siebert and Defendant, he reached down to grab his taser and when he looked up Defendant was staring at him with his gun pointed directly at him. Harhay indicated that he saw a "large flash" and realized he had been shot. Harhay then described his injury, his retreat from the scene, his medical treatment and lasting effects from the gunshot *Page 10 
wound. Harhay agreed with Michalak that none of the officers wore SWAT gear. Harhay identified the clothing he wore that day, a diagram of the scene, and Defendant.
 {¶ 25} Sergeant Phillips was employed by the Sheriffs Department on September 7, 2006, and responded to the scene. His testimony supported that of the other officers. Phillips also indicated that he ordered Defendant to drop his weapon to which Defendant responded, "If I had more bullets, I would continue to shoot with you — — shoot at you." Phillips identified Defendant, the gun used by Defendant and various photographs of the scene.
 {¶ 26} Joyce Theodecki was chief of the Litchfield Fire Department on September 7, 2006, who responded to the scene with the paramedics and treated Harhay's wound. Theodecki described the wound and its proximity to the carotid and jugular arteries as well as the spinal cord. Theodecki testified that her squad also gave assistance to Defendant and both Harhay and Defendant were life-flighted to the hospital.
 {¶ 27} Deputy Todd Heckel was employed by the Sheriffs Department and guarded Defendant at the hospital. Heckel testified that Defendant told him on September 8, 2006, to tell Harhay he was sorry. Heckel stated that he did not have any difficulty understanding Defendant when he spoke and that Defendant appeared rational and logical.
 {¶ 28} Deputy Dennis Mayer was employed by the Sheriffs Department on September 7, 2006, and guarded Defendant at the hospital. Mayer's testimony supported that of Heckel. Mayer also noted that during the days following September 7, 2006, Defendant did not exhibit any signs of mental illness.
 {¶ 29} Deputy Sandra Faber was also employed by the Sheriffs Department on September 7, 2006, and monitored Defendant at the hospital. Faber testified that Defendant asked her if there had been any "copycat shootings." Faber testified that she had taken a year of *Page 11 
psychology classes in college and "had OPOTA training on how to recognize and deal with the emotionally disturbed." Faber explained that based on her training and experience, she had the ability to discern somebody who was exhibiting symptoms of mental illness and that Defendant did not exhibit any such symptoms. Faber stated that Defendant looked her directly in the eye and spoke rationally and in full sentences. Faber testified that Defendant also asked to play cards with her and her co-workers and at no time exhibited signs of being psychotic or mentally ill.
 {¶ 30} Deputy Steve Clark was employed by the Sheriffs Department on September 7, 2006, and responded to the scene with Siebert. Clark's testimony supported that of the other officers. Clark additionally noted that the police had been told prior to arriving at the scene that Defendant "had been attending militia meetings, resulting in very antigovernment feelings[.]" Clark testified that he fired his gun five times during the altercation and saw Defendant shoot Harhay. Clark indicated that Defendant made eye contact with him during the shooting. Clark identified a diagram of the scene and Defendant.
 {¶ 31} Officer Brian Schmitt was employed by the Brunswick City Police Department on September 7, 2006. Schmitt testified that he responded to "process the scene for evidence and diagram it." Schmitt explained that it is protocol to have another agency investigate a scene where there has been an officer shot. Schmitt noted that when he arrived at the scene, neither Defendant nor any of the original responders was still there. Schmitt identified the diagram of the scene that he prepared that day and explained its markings. Schmitt testified that he and Kiernozek marked all of the evidence with the number tag system and identified the evidence and photographs of the evidence marked. Schmitt identified a shotgun, ammunition, BB pellet gun, a "pill bottle" that could be used as a smoking device for crack or marijuana, green vegetable matter consistent with marijuana, a digital scale, rolling papers, rolling machine, *Page 12 
plastic bags with marijuana seeds, a lighter, and a pewter container found in Defendant's home. Schmitt also identified a piece of paper from Fairlawn Mayor's Court with handwriting scribbled on it and other pictures of the inside of Defendant's home. Schmitt noted that the picture of the fire in the back yard showed remnants of a television, four-wheeler, and a computer.
 {¶ 32} Mike Mohler was employed by the Medina Life Support Team on September 7, 2006 as a paramedic. Mohler testified that he rendered aid to Defendant and transported him to the life flight helicopter. Mohler testified that Defendant had been shot four times and identified photographs of Defendant's wounds.
 {¶ 33} Jeff Claridge, M.D. was surgeon at MetroHealth Hospital on September 7, 2006, and treated Harhay. Dr. Claridge testified that Harhay was fortunate as his wound was an inch away from his airway and one-quarter inch to one-half inch from major blood vessels in his neck. Dr. Claridge stated that injuries to either of these locations would have been life-threatening. Dr. Claridge identified photographs of Harhay's injuries. Dr. Claridge also testified that he performed surgery on Defendant and identified each of his injuries.
 {¶ 34} J. Tadd Davis was employed by the Sheriffs Department on September 7, 2006, and responded to the scene. Davis testified that he spoke to Defendant's wife and identified the consent form signed by Ms. Latham giving police permission to search Defendant's home. Davis testified that it was Brunswick police officers that actually conducted the search. Davis stated that he transported firearm evidence to BCI for testing and identified that evidence.
 {¶ 35} Joseph McDermott was a detective for the City of Brunswick Police Department on September 7, 2006. McDermott's testimony supported that of the other officers. McDermott also identified the casings used by the officers and testified that the cartridges from Defendant's *Page 13 
weapon were still in the weapon. McDermott stated that it was he who brought the evidence collected at the scene to court.
 {¶ 36} Jason Jackson was a friend of Defendant and lived with Defendant starting in May of 2006. Jackson testified that he noticed something different about Defendant around that time. Jackson explained that Defendant started reading the Bible, expressing anti-government sentiments, and smoking marijuana more frequently than normal, including every morning on the way to work. Jackson admitted that he often smoked marijuana with Defendant. Jackson stated that Defendant also started attending meetings with Jackson's father. Jackson noted that Defendant also broke his collar bone and was unemployed for a period during this time.
 {¶ 37} Jackson testified that he was with Defendant when Defendant received a speeding ticket on April 8, 2006, and acknowledged that Defendant sped up to avoid the officer, cutting across several marked lanes before finally being stopped by the officer with his gun drawn. Jackson noted that Defendant had received three tickets that year — two in Rocky River and one in Fairlawn. Jackson finally testified that he was with Defendant the night prior to the shooting and that Defendant had been depressed. Jackson stated that he gave Defendant a psychologist's business card. Jackson admitted that Defendant never told him he heard voices or that the TV was talking to him and trying to control his thoughts.
 {¶ 38} Mark Brummer worked with Defendant and the two became friends. Brummer stated that he started noticing changes in Defendant during the summer of 2006. Brummer indicated that Defendant seemed depressed. Brummer testified that Defendant called him on September 7, 2006, and told him he was cleaning up and getting rid of things. Brummer indicated that Defendant was very upset on the phone and "bawling," but declined Brummer's help. Brummer testified that he "knew something was really wrong." Brummer stated that he *Page 14 
immediately went to Defendant's home and noticed him throwing things on a fire in his back yard including a brand-new ATV. Brummer said he rushed back to try to help Defendant by putting out the fire, but Defendant pulled him back, saying, "this thing, it's got to burn." Brummer stated that Defendant refused to allow him to call the fire department, stating that, "It's corporate. It's evil. It's got to burn. * * * It's part of the oil industry." Brummer indicated that it was "total chaos in the conversation of trying to understand what [Defendant] was saying." Brummer testified that he tried to get Defendant to leave the scene but he refused. Brummer stated that "one minute [Defendant's] kind of crying, the next minute he's just sitting there shaking." Brummer testified that his wife was eventually able to get Mrs. Latham's phone number from Defendant although Defendant had a hard time remembering the number. Brummer noted that Defendant was completely distraught and "totally gone. He was not the person I knew." Brummer denied that Defendant appeared intoxicated or high.
 {¶ 39} Brummer indicated that Defendant eventually ordered him to leave, but noted that he did not want to leave him and did not know what Defendant was going to do. Brummer indicated that he eventually left, went to the Smokehouse restaurant nearby and waited for the Sheriffs Department, who had been called by Mrs. Brummer. Brummer explained that he told the officers that Defendant was acting irrational and that they needed to get him to a hospital.
 {¶ 40} On cross-examination, Brummer acknowledged that: (1) he did not know Defendant smoked marijuana; (2) that Defendant never exhibited any similar symptoms; (3) that Defendant never told him he had been hearing voices or that the television, computer or electrical items were trying to control him; (4) that Defendant felt that people were talking about him behind his back; (5) that Defendant was disappointed about a failed invention; (6) that Defendant owned a .22 revolver and had one in his pocket on September 7, 2006; and (7) or any *Page 15 
of the details of Defendant's court appearances in Rocky River or Fairlawn. Brummer noted that he was aware that Defendant attended "We the People" meetings, but that he did not know anything about it. Brummer denied that Defendant expressed anti-government sentiments to him on September 7, 2006. Brummer finally admitted that Defendant did not want him to try to pull the four-wheeler from the fire because of the nearby gas cans, thereby expressing rational concern for his friend.
 {¶ 41} Joyce Brummer is Brummer's wife. Her testimony supported that of her husband. Mrs. Brummer also noted that she told the officers that Steve was "having some kind of mental break." Brummer testified that she heard Jackson tell police, "Please don't shoot Steve" and that she told police she did not trust Jackson. Mrs. Brummer stated that although it took Defendant a minute to give her his wife's cell phone number, he was able to give her the correct number. Mrs. Brummer denied telling the police that Defendant attended militia meetings and indicated that she did not know Defendant smoked marijuana. Both Mr. and Mrs. Brummer acknowledged that they did not immediately call 9-1-1 on September 7, 2006, despite their concern for Defendant.
 {¶ 42} Harry Pollock, M.D. is a psychiatrist at MetroHealth Hospital. He was the consulting psychiatrist to Defendant and first spoke to Defendant a day or two after the incident. Dr. Pollock described Defendant as "paranoid and very frightened" and indicated that Defendant was having delusions that people could read his mind. Dr. Pollock stated that he diagnosed Defendant with delusional disorder, which is the new term for paranoia, and is a member of the psychoses category of psychiatric illnesses. Dr. Pollock indicated that the disorder "really has to do with an irrational thought," and noted that such people can "manage their lives while still having the delusion" until "the anxiety associated with it becomes greater and greater [and] they *Page 16 
become unable to manage their own lives." Dr. Pollock further noted that persons with delusional disorder are still able to do things during this process and "don't completely lose their ability to make logical acts." Dr. Pollock testified that he prescribed an antipsychotic drug to treat Defendant. Dr. Pollock agreed that at the time he saw Defendant, Defendant "was suffering from a severe mental disease * * * that kept him from understanding the right and wrong of his conduct." Dr. Pollock testified that Defendant did not appear depressed or suicidal.
 {¶ 43} On cross-examination, Dr. Pollock admitted that he only saw Defendant for 45 minutes to one hour and that several of Defendant's delusions were based in fact. Dr. Pollock also admitted that his testimony differed slightly from his telephone interview with the prosecution. Dr. Pollock acknowledged that while he was not sure if Defendant knew the wrongfulness of his actions during the telephone interview, upon further consideration, his "intuitive conclusion" was that he did not. Dr. Pollock admitted that he never asked Defendant about the events of September 7, 2006, never spoke with Mrs. Latham, never spoke with police or witnesses, never read police reports, did not know the scope of Defendant's marijuana use although his blood test was positive, did not know that Defendant had gotten high the evening of September 6, 2006, and the morning of September 7, 2006, and did not know of Defendant's experiences in traffic court the day before. Dr. Pollock acknowledged that such information would have been helpful to his diagnosis. Dr. Pollock also stated that he would defer to Dr. Noffsinger's diagnosis with regard to insanity because testifying as to the whether a person is legally insane "is what he does for a living." Dr. Pollock also noted that he would defer to any forensic psychiatric expert on this issue.
 {¶ 44} Dr. Kathleen Stafford is a forensic psychologist and director of the Psycho-Diagnostic Clinic, which received a court order to evaluate Defendant's sanity at the time of his *Page 17 
act. Dr. Stafford testified that she met with Defendant on two occasions for a total of four and one-half hours and administered three psychological tests. Dr. Stafford indicated that she interviewed him to obtain his history as well as current mental state and functioning. Dr. Stafford indicated that although Defendant's family had a history of mental illness, Defendant did not have such a history prior to this case. Dr. Stafford relied upon various information and documents in rendering her opinion.
 {¶ 45} Regarding the date of the incident, Dr. Stafford indicated that Defendant told her he had started reading the bible and attending "We the People" meetings in the months prior to the shooting. Dr. Stafford said that Defendant told her he had started applying We the People's view that courts do not always uphold the law correctly. Dr. Stafford stated that Defendant told her he burned his belongings based upon a biblical message to rid one's self of spoils. Dr. Stafford testified that Defendant did not know when he put the gun in his pocket or why he had done so. Defendant also indicated that he initially doubted whether the officers at his house were really police, but indicated that he later determined they were police and removed the gun to drop it on the ground. Dr. Stafford indicated that Defendant told her he only shot the gun after he was shot with the taser.
 {¶ 46} Dr. Stafford acknowledged that Defendant told the initial consulting psychiatrist he tried to commit suicide by pointing a gun at the police and that he had been hearing voices for years after a blackout due to alcohol use. Dr. Stafford testified that she did not give much weight to the fact that this statement conflicted with what Defendant told her about the events that night because Defendant was still on pain medications from surgery, although she admits she did not speak with anyone at the hospital to determine whether Defendant was thinking clearly when he made this statement. Dr. Stafford testified that Defendant told her he had a history of smoking *Page 18 
marijuana several times per week and that he smoked it daily while on disability leave but had quit drinking several months prior to his arrest.
 {¶ 47} Dr. Stafford testified that the test results indicated that Defendant was of average intelligence, "was not exaggerating problems or reporting symptoms that [were not] genuine," and demonstrated three types of problems: (1) distress about his physical health due to his gunshot wounds; (2) depression/self-consciousness; and (3) paranoid thinking. Dr. Stafford stated that the test results and Defendant's history were consistent with her opinion that Defendant suffered from major depressive order with psychotic features. Dr. Stafford also diagnosed Defendant with cannabis dependence. Dr. Stafford opined that Defendant "was suffering from a severe mental disease at the time of the offenses, and that as a result he did not know the wrongfulness of [his] acts[.]" Dr. Stafford testified that Defendant did not know the wrongfulness of his conduct because his behavior was irrational and "he had a misperception of the entire event."
 {¶ 48} Dr. Stafford testified that Defendant was suffering from cannabis-induced psychotic disorder. She further stated that the symptoms Defendant was displaying on September 7, 2006, were not a result of marijuana intoxication because the symptoms continued, albeit not as extreme. Dr. Stafford disagreed with the conclusion that because Defendant apologized to the officers, he knew his conduct was wrong. Instead, Dr. Stafford testified, the apology demonstrated that Defendant "was not in his right mind" and acted out of character on September 7, 2006.
 {¶ 49} On cross-examination, Dr. Stafford testified that she would never opine as to whether a person knew the wrongfulness of conduct at the time of an offense without reading or talking to the person about the event or reading police reports or witness statements as Dr. *Page 19 
Pollock had done. Dr. Stafford also noted that the statements Defendant made to the police during and after the shooting did not reflect everything he was thinking at the time. Dr. Stafford denied that an examination of Defendant made two and one-half months after the event would not be as accurate as one done immediately after the event and indicated that it did not bother her that Defendant's later rendition of events to her was in direct conflict with all of the witnesses and police officers and Defendant's earlier statements. Dr. Stafford finally acknowledged that Defendant's statement that he intended to drop the gun on the ground indicated that he knew it was wrong to raise a gun at police. Dr. Stafford asserted that the inconsistencies in Defendant's stories do not demonstrate that he knew his conduct was wrong because he had a perverted perception of reality as a result of his mental illness.
 {¶ 50} John Castele testified as a rebuttal witness on behalf of the State. Castele was a prosecutor for the City of Fairview Park operating from the Rocky River Municipal Court on September 7, 2006, when Defendant appeared to challenge three traffic-related charges. Castele indicated that a plea bargain was reached on one charge and the other two charges were dropped. Castele testified that Defendant represented himself, negotiated the plea bargain, was rational, and did not cry or exhibit any signs of being psychotic or otherwise mentally ill. Castele explained that Defendant said he "just want[ed] to get this resolved today."
 {¶ 51} Cristy Rickbrodt also testified as a rebuttal witness for the State. Rickbrodt is employed as a social worker for Alternative Paths and evaluated Defendant on October 4, 2006. Rickbrodt testified that Defendant told her that he had never had, and did not currently have, any suicidal thoughts. Rickbrodt stated that Defendant's thoughts were lucid and organized during questioning and that he had good concentration. Rickbrodt acknowledged that Defendant also told her he was "feeling much better since starting his meds." Rickbrodt noted, however, that on *Page 20 
November 15, 2006, while still on his medication, Defendant told her he was starting to think about the bible a great deal again. Rickbrodt noted that Defendant continued not to exhibit psychotic symptoms.
 {¶ 52} Stephen Noffsinger, M.D. is a licensed physician and forensic psychiatrist employed by the State to evaluate Defendant concerning the issue of his sanity at the time he committed the offenses. Dr. Noffsinger testified that in conducting his evaluation, he reviewed: (1) the bill of particulars; (2) police records; (3) crime scene photographs; (4) Harhay's medical records; (5) Defendant's medical records from 1992, summer of 2006, this incident, jail, and of his hospitalization while in jail for this incident; (6) Medina LifeFlight records; (7) records from Psycho-Diagnostic Clinic (which included Dr. Stafford's notes, report by Joanne Arndt) and (8) Defendant's school records. Dr. Noffsinger also interviewed: (1) Defendant; (2) Seibert; (3) Harhay; (4) Michalak; (5) Defendant's employer; (6) Jackson; and (7) the Brummers. Dr. Noffsinger also reviewed an audiotape from the Rocky River court proceeding, but not until after he had issued his opinion.
 {¶ 53} Dr. Noffsinger's testimony as to Defendant's family and mental history supported that of Dr. Stafford. Dr. Noffsinger also noted that Defendant told him of his prior drug use, predominantly marijuana and that his use of marijuana had increased to two or three times daily after he broke his collar bone and was not working. Dr. Noffsinger indicated that Defendant told him he only drank two beers per week. Dr. Noffsinger stated that, despite Defendant's initial statement the he had no mental health issues prior to the shooting, he later stated that he started having paranoid delusions four years prior. Dr. Noffsinger testified that Defendant told him that he believed people were making fun of him, that Taco Bell and Vonage commercials made fun of him, and that people in chat rooms talked about him in the "underground internet." *Page 21 
Dr. Noffsinger indicated that he did not see any reference to the "underground internet" in any other psychiatric expert's reports.
 {¶ 54} Dr. Noffsinger testified that Defendant's employer told him that Defendant was a good worker, did not have any conflicts with other employees and that he did not see any strange behavior prior to Defendant going on disability leave. Dr. Noffsinger also noted that none of Brummer, Mrs. Brummer, or Mrs. Latham reported that Defendant had told them that people were after him or that TV was making fun of him. Instead, they simply told him that Defendant was "mildly depressed."
 {¶ 55} Dr. Noffsinger testified that Defendant described himself as becoming stressed out beginning in June of 2006, because he was making less money, his wife was upset with him for not working, he was smoking too much marijuana, was sleeping less, drinking energy drinks, and did not want to leave the house. Dr. Noffsinger stated that Defendant told him he began to read the Bible, focusing on "verses about how your enemy grows," but did not go to church or pray. Dr. Noffsinger indicated that Defendant told him he had several traffic tickets and was going to fight the tickets based on advice he got from a group called "We the People" that met at Panera Bread in Fairlawn, which group was led by an individual named "Sovereign." Defendant told Dr. Noffsinger that he had gone to at least six meetings, had a homemade binder of information, and that the group discussed "various antigovernment policies and practices." Dr. Noffsinger testified that Defendant then explained to him that he just paid the tickets because he believed there were government agents in the courtroom. Dr. Noffsinger noted that Mrs. Latham's rendition of how Defendant handled the traffic tickets contradicted Defendant's.
 {¶ 56} Regarding the events of September 7, 2006, Dr. Noffsinger stated, that Defendant told him that he was tearful at court that morning, but just paid the fine and left because he was *Page 22 
worried that government wanted to harm him or his wife. Defendant told Dr. Noffsinger that his psychotic thinking increased throughout the day including thoughts that President Bush was the antichrist and that some people might think Defendant was the messiah. Dr. Noffsinger explained that Defendant acknowledged he put a gun in his pocket at some point that day. Dr. Noffsinger stated that Defendant told him that he decided to clean out his barn in response to a passage in the bible that told him to rid himself of "spoils," so he called Brummer to help. Defendant indicated that he smoked marijuana again before Brummer arrived and after Brummer left. Dr. Noffsinger then testified that Defendant told him that he started throwing things in the fire because they were evil and that he told Brummer to leave because there could have been an explosion and it was not safe. Dr. Noffsinger stated that Defendant's concern for Brummer indicated that Defendant had rational thought.
 {¶ 57} Dr. Noffsinger then testified as to Defendant's explanation of events after the police arrived. Defendant indicated that the officers asked him if he had a gun, to which he responded that he did, and that as he pulled the gun out to drop it on the ground, an officer tased him. Dr. Noffsinger stated that Defendant told him he then began to fire his gun in a general direction but not at any particular officer because he thought the officers were attacking him. Dr. Noffsinger said it did not make sense to him that Defendant stated he fired in a general direction but yet also indicated that he was trying to defend himself. At one point, Dr. Noffsinger testified, Defendant seemed to imply that the shooting was an involuntary muscle spasm in response to being tased. Defendant finally told Dr. Noffsinger that he did not shoot Harhay; other officers had done so as to justify their shooting of Defendant.
 {¶ 58} Dr. Noffsinger testified that he asked Defendant if he knew it was against the law to shoot at people and Defendant responded, "I didn't think about it. I'm not sure what I was *Page 23 
thinking about." Defendant denied that his conduct was the "right thing," and noted that "it just happened." Ultimately, Dr. Noffsinger testified as to the differences in Defendant's various renditions of events and the police reports and determined that Defendant was "trying to assert several different defenses at the same time just trying to see which one stuck to the wall, which one seemed to work best for him." Dr. Noffsinger testified that he saw evidence of symptom exaggeration by Defendant.
 {¶ 59} Dr. Noffsinger testified to various facts that demonstrated Defendant knew of the wrongfulness of his conduct: (1) Defendant used a small weapon because it was easier to conceal, rather than larger guns he had in his house; (2) the shooting occurred within 24 hours of Defendant's traffic court appearance indicating a motive other than legal insanity; (3) Defendant's psychosis resolved itself after the effect of the marijuana wore off; (4) Defendant explained his conduct to Rickbrodt as being because he was mentally stressed; (5) Defendant asked to be allowed to move around the pod during lockdown, which a person suffering from paranoid delusions would not do; (6) Gail Carmon's concern that Defendant was manufacturing his symptoms as a defense for the shooting; (7) Dr. Brar's diagnosis of marijuana dependence and her inability to exclude that dependence at the cause of Defendant's mental illness; and (8) Defendant exhibited no signs of mental illness to the Alternative Path staff.
 {¶ 60} Dr. Noffsinger opined "[t]hat at the time of the offense, * * * [Defendant] didn't have, in my opinion, a severe mental disease or defect." Dr. Noffsinger testified that none of Defendant's three diagnoses constituted a mental disease or defect, i.e., marijuana intoxication, marijuana dependence, and marijuana-induced psychosis, all flowing from his voluntary use of marijuana. Dr. Noffsinger opined that at the time of the offense, Defendant had "a temporary transient psychosis in response to his marijuana intoxication." *Page 24 
 {¶ 61} Dr. Noffsinger discounted the argument that Defendant's condition improved only because of the anti-psychotic drugs he was taking, noting that, "the fact that it cleared up so rapidly [by September 18, 2006] * * * indicates that the major factor was getting the marijuana out of his system." Dr. Noffsinger stated that "if [Defendant] had a * * * freestanding mental illness, * * * he would have been psychotic longer." Dr. Noffsinger testified that per the DSM-4, the diagnostic manual for psychosis, depression and substance abuse cannot occur concurrently. Dr. Noffsinger stated that because "they are categorically incompatible" from a diagnostic standpoint, and opined that, Dr. Stafford's diagnosis of major depressive order with psychotic features and marijuana dependence was wrong. Dr. Noffsinger also noted that Defendant's "misunderstanding" about the events that were occurring that day is "not relevant to an insanity defense." Neither, indicated Dr. Noffsinger, is Defendant's explanation that he "accidentally" shot the officers in response to being tased, and the fact that Defendant shot his gun five times indicated the shooting was not an accident. Finally, Dr. Noffsinger stated, anger (at government officials) is similarly not consistent with being insane. Dr. Noffsinger testified that what Defendant said to the police during and just after the shooting is "much more powerful" evidence as to what Defendant was thinking at the time than "what he says about his mental health history five weeks later in jail." Dr. Noffsinger explained that, "[a]nger is a rational motive" and indicative of knowledge of wrongfulness. Moreover, "fleeing indicates knowledge of wrongfulness[.]" Dr. Noffsinger testified that Defendant knew the wrongfulness of his conduct on the date of the offense and "would fail both arms of the test for insanity."
 {¶ 62} Dr. Noffsinger additionally criticized Dr. Stafford's opinion because she did not account for the multiple police reports about Defendant's conduct during the offense and did not talk with all of the collateral informants. Dr. Noffsinger noted that "because defendants have *Page 25 
got a motive to malinger or distort information, [forensic examiners] don't take their account at face value." Dr. Noffsinger testified that Dr. Stafford did not verify or corroborate what Defendant told her and took his account at face value. Dr. Noffsinger also discounted the tests used by Dr. Stafford as being only helpful to determine the patient's functioning on the date the test is given, not on the date of the offense. Moreover, Dr. Noffsinger indicated, there was evidence, based on his review of the raw data, that one of Dr. Stafford's tests was invalid.
 {¶ 63} On cross-examination, Dr. Noffsinger agreed that Defendant was psychotic on September 7, 2006, but noted that the psychosis "flowed from the voluntary use of marijuana." Dr. Noffsinger also acknowledged that a paranoid person could operate a vehicle and that "[p]eople who are psychotic can still do some rational things." Dr. Noffsinger reminded the court that all three experts agree that Defendant was psychotic at the time of the offense; "[t]he issue is whether it flowed from his voluntary use of marijuana." Dr. Noffsinger noted that Defendant's beliefs on the day of the crime would only be psychotic if they were a "fixed" or "truly-held" beliefs "reported to someone else long ago" and upon which Defendant would have changed his behavior. Dr. Noffsinger testified that such was not the case with Defendant.
 {¶ 64} Based on our review of the entire record, we conclude that Defendant's criticisms of the State's evidence in this case are inadequate to prove that the jury lost its way and created a manifest miscarriage of justice. Otten, 33 Ohio App.3d at 340. Rather, we find it reasonable that the jury believed the State's version of the events, including that Defendant acted knowingly and that Defendant had "the capacity either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law." State v. Staten (1969),18 Ohio St.2d 13, paragraph one of the syllabus. "`Culpable mental states may be shown by circumstantial as well as direct evidence.'" State v.Kincaid, 9th Dist. No. 01CA007947, 2002-Ohio-6116, at ¶ 22, quoting *Page 26 Kreuzer v. Kreuzer (2001), 144 Ohio App.3d 610, 613. Moreover, "[w]hen the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." State v. Daniels (Jun. 3, 1998) 9th Dist. No. 18761, at *2, quoting Jenks, 61 Ohio St.3d at paragraph one of the syllabus. Thus, despite a mental illness assessment, a jury could find that a defendant acted knowingly. See City of Avon Lake v. Charles, 9th Dist. No. 07CA009117, 2008-Ohio-998, at ¶ 26.
 {¶ 65} "The mere fact that the jury chose to believe the testimony of the prosecution's witnesses does not render a verdict against the manifest weight." State v. Wright, 9th Dist. No. 03CA0057-M,2004-Ohio-603, at ¶ 17, citing State v. Moore, 9th Dist. No. 03CA0019,2003-Ohio-6817, at ¶ 18 and State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. We conclude that Defendant's conviction was not against the manifest weight of the evidence and, consequently, is also based on sufficient evidence. Roberts at *2. The trial court properly denied Defendant's Crim. R. 29 motion.
 {¶ 66} Defendant's first and second assignments of error are overruled.
 Assignment of Error IV "[Defendant] was not afforded effective assistance of counsel."
 {¶ 67} In his last assignment of error, Defendant asserts that he was denied the effective assistance of counsel because defense counsel: (1) failed to make "any effort to preclude evidence at trial either through motions to suppress, motions in limine, or objections to evidence at trial" and (2) failed to object to Dr. Noffsinger's testimony, which allegedly relied upon inadmissible hearsay and information not admitted into evidence. *Page 27 
 {¶ 68} We analyze claims of ineffective assistance of counsel under a standard of objective reasonableness. See Strickland v. Washington
(1984), 466 U.S. 668, 688; State v. Bradley (1989), 42 Ohio St.3d 136,142. A defendant must demonstrate deficiency in trial counsel's performance "so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment" and that the errors were "so serious as to deprive the defendant of a fair trial[.]"Strickland, 466 U.S. at 687. In applying this test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Id. at 689. Trial strategy "must be accorded deference and cannot be examined through the distorting effect of hindsight." State v. Conway, 109 Ohio St.3d 412,2006-Ohio-2815, at ¶ 115. "A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable possibility that the outcome of the trial would have been different."State v. Myers, 9th Dist. No. 23853, 2008-Ohio-1913, at ¶ 28, citingStrickland, 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."Strickland, 466 U.S. at 691.
 {¶ 69} Defendant has not demonstrated error by trial counsel. "[A]s a matter of law, the decision of whether or not to file a motion to suppress is a trial strategy." State v. Downing, 9th Dist. No. 22012,2004-Ohio-5952, at ¶ 20, citing State v. Fisk, 9th Dist. No. 21196, 2003-Ohio-3149, at ¶ 9 and State v. Phillips (1995), 74 Ohio St.3d 72,85. Similarly attorney's decisions to "not object at certain times during trial are `debatable trial tactics [that] generally do not constitute a deprivation of effective counsel.'" Fisk at ¶ 9, quotingPhillips, 74 Ohio St.3d at 85, citing State v. Clayton (1980),62 Ohio St.2d 45, 49. We have also held that, "[w]e will not second-guess trial counsel's decision regarding the filing of a motion in limine as this motion *Page 28 
falls within the purview of trial strategy." City of Elyria v.Bozman, 9th Dist. No. 01CA007899, 2002-Ohio-2644, at ¶ 16.
 {¶ 70} It is true that trial counsel's specific failure to object to Dr. Noffsinger's testimony, to the extent it relied upon allegedly hearsay materials and/or materials not admitted into evidence, could be construed as error under the facts of this case. If Dr. Noffsinger had not been permitted to render his opinion, there would have been no expert opinion contradicting Defendant's assertion and expert testimony supporting that assertion, that he was not guilty by reason of insanity. However, as acknowledged by the Supreme Court of Ohio, in State v.Brown (1983), 5 Ohio St.3d 133, 134-35, "`[i]t is not necessary for the Government to present any expert testimony to meet its burden of proof. The Government can meet its burden through the testimony of lay witnesses. A defendant is not entitled to a judgment of acquittal simply because he offers expert testimony on the issue of insanity and the Government attempts to rebut it without any expert witnesses. The expert's opinion, even if uncontradicted, is not conclusive. At the same time, it may not be arbitrarily ignored, and some reasons must be objectively present for ignoring expert opinion testimony.'" (Internal citations omitted). Id., quoting United States v. Mota (C.A.5 1979), 598 F.2d 995. See, also State v. Hottle (Mar. 12, 1986), 9th Dist. No. 2126, at *2 (holding that jury was entitled to give more weight to the state's evidence that defendant was not insane at the time of the crime, which evidence was not solely limited to expert opinion). As set forth above in our discussion of Defendant's first and second assignments of error, there was ample other evidence from which the jury could have determined that Defendant knew the wrongfulness of his conduct on September 7, 2006.
 {¶ 71} Moreover, Dr. Noffsinger was extensively cross-examined about the basis of his opinion. Finally, as noted above, Dr. Stafford relied on much of the same materials in issuing *Page 29 
her opinion and Dr. Stafford herself discounted Dr. Pollock's opinion.[1] Defendant has not established the second prong of theStrickland test, i.e., that he was prejudiced by trial counsel's failure to object to Dr. Noffsinger's testimony. Defendant's fourth assignment of error is overruled.
 {¶ 72} Defendant's assignments of error are overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30. *Page 30 
Costs taxed to Appellant.
MOORE, J. CONCURS
[1] We note that the State asserts that the parties agreed prior to trial that there would be no foundational objections at trial. However, as the State concedes, this stipulation is not part of the record and we, therefore, cannot consider whether such agreement occurred.